[No. S127176. Aug. 31, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES G. POKOVICH, Defendant and Appellant.

**COUNSEL**

Hayes H. Gable III, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Carlos A. Martinez, Janet E. Neeley, Ruth M. Saavedra and Robert Gezi, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KENNARD, J.**—May a testifying defendant be impeached at trial with statements made before trial to mental health professionals during a court-ordered examination to determine the defendant's mental competency to stand trial? We conclude that such impeachment violates the federal Constitution's privilege against self-incrimination.

I

On March 31, 2002, at approximately 3:00 p.m., bullets hit three moving vehicles on Iron Mountain Road near Keswick, Shasta County. Around the same time, bullets hit another car, occupied by Joyce Muse and her fiancé,

Lawrence Taylor, going down the driveway at the home of Muse's parents, who lived across from defendant Charles G. Pokovich on Iron Mountain Road. Taylor saw defendant standing across the street with a rifle; defendant yelled at Taylor and Muse to get off his property.

After receiving telephone calls reporting the shootings, Shasta County Sheriff deputies set up roadblocks in the area. Defendant came up to them and said he might be the person they were looking for because Joyce Muse appeared to believe that he had shot at her. He consented to a search of his mobilehome. Found inside were a rifle and ammunition; in addition, five shell casings that matched defendant's rifle were retrieved from an area in front of the home. A bullet fragment recovered from one of the cars hit earlier matched the ammunition and the rifle recovered from defendant's home.

Defendant was charged with four counts of shooting at an occupied vehicle (Pen. Code, § 246)[1] and eight counts of assault with a firearm (§ 245, subd. (a)(2)). It was also alleged that he personally used a firearm. (§ 12022.5, subd. (a).)

On April 22, 2002, one day before the preliminary hearing was to be held, defense counsel expressed to the trial court his concern about defendant's mental competence to stand trial (§ 1368, subd. (b)), based on "certain of his conduct which would indicate hallucinations, that there's a certain lack of reality . . . ." The court suspended criminal proceedings and appointed two mental health professionals—Dr. Aravind K. Pai, a psychiatrist, and Dr. Kent R. Caruso, a licensed psychologist—to examine defendant. (§ 1369.) Both did so; their written reports to the trial court expressed their view that defendant was competent to stand trial. The defense waived the right to a jury trial on the issue (§ 1369) and submitted the matter to the court based on the reports of the mental health experts. The court ruled that defendant was competent to stand trial.

Defendant testified at trial. On direct examination by his attorney, he said that around 10:00 o'clock on the morning of the shootings he fired shots from his .22-caliber rifle to scare blue jays from the trees on his property. At 3:00 o'clock that afternoon, he went out on his porch because he heard a car come down the Muses' driveway. Defendant saw Joyce Muse get out of a car; she yelled that she was calling the police. Defendant described Muse as an intimidating person who on occasion was loud and obnoxious.

On cross-examination by the prosecutor, defendant denied drinking any alcohol the day of the shooting. During a recess, the trial court discussed a

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

statement the prosecutor had made earlier at a bench conference. In that statement, the prosecutor announced an intention to impeach defendant with inconsistent statements defendant had made earlier to the two court-appointed mental health professionals during the competency evaluations. The court told the prosecutor to provide the court and defense counsel with citations of authority to support the claim that defendant could be impeached with the statements in question. The case was continued to the next morning. At that time, over defendant's objection, the trial court ruled that the prosecution could use the statements to impeach defendant.

When the prosecutor resumed the cross-examination, defendant admitted that, during the competency examination, he had told Dr. Pai that he drank two cans of beer the day of the shootings and that he got along with Joyce Muse and his other neighbors; defendant also testified he had not told Dr. Caruso that he was shooting at blue jays and rabbits on the day in question. Dr. Caruso, called as a rebuttal witness by the prosecution, then testified that during the competency evaluation defendant told him he was aware of multiple shots being fired at cars from the direction of his property at the time defendant claimed he was shooting at blue jays and rabbits.

The jury convicted defendant of all charges and found true the allegation that he personally used a firearm in committing the assaults. The trial court sentenced defendant to an aggregate term of 16 years 4 months in prison. The Court of Appeal affirmed, holding that a testifying defendant may be impeached at trial with statements made to mental health professionals during a pretrial competency evaluation. Defendant petitioned this court for review, noting the long-standing conflict in decisions of the Courts of Appeal on this issue. (Compare *People v. Stanfill* (1986) 184 Cal.App.3d 577, 581 [229 Cal.Rptr. 215] [statements may be used to impeach] with *People v. Harris* (1987) 192 Cal.App.3d 943, 949 [237 Cal.Rptr. 747] [statements may not be used to impeach] and *Baqleh v. Superior Court* (2002) 100 Cal.App.4th 478, 499, fn. 5 [122 Cal.Rptr.2d 673] [citing *Harris* with approval].) We granted review.

## II

Defendant contends the trial court violated his constitutional privilege against self-incrimination (U.S. Const., 5th Amend.) when it allowed the prosecution to impeach him at trial with statements he had made to the two court-appointed mental health professionals who were to determine his competency to stand trial. He argues that his statements were legislatively compelled and therefore could not be used either as substantive evidence of his guilt or for the purpose of impeaching him.

■ Our Legislature has declared that a "person cannot be tried or adjudged to punishment while that person is mentally incompetent." (§ 1367, subd. (a); see *Pate v. Robinson* (1966) 383 U.S. 375, 378 [15 L.Ed.2d 815, 86 S.Ct. 836] [conviction of legally incompetent person violates due process]; *People v. Perry* (1939) 14 Cal.2d 387, 397–399 [94 P.2d 559] [§ 1367 codifies common law rule].) If the trial court has a doubt about the mental competency of a defendant, whether arising from the court's own observation or that of counsel, it must suspend the criminal proceeding and appoint a licensed psychiatrist or a licensed psychologist and any other expert the court considers appropriate to examine the defendant to determine the nature of the defendant's mental disorder, if any. (§§ 1368, 1369.)

Thus, competency proceedings are initiated by the trial court, not the defendant. The defendant cannot refuse to undergo a psychiatric examination and cannot waive the right to a trial on the issue of competency. (*Centeno v. Superior Court* (2004) 117 Cal.App.4th 30, 43 [11 Cal.Rptr.3d 533].) Because our statutory scheme governing competency to stand trial does not give the defendant the right to refuse to submit to the competency examination, it implicates a defendant's federal constitutional privilege against self-incrimination. (U.S. Const., 5th Amend.)

Pertinent here is the Court of Appeal's decision in *Tarantino v. Superior Court* (1975) 48 Cal.App.3d 465 [122 Cal.Rptr. 61] (*Tarantino*). There, the court balanced the state's need for accurate competency evaluations against the need for safeguarding the accused's constitutional right against self-incrimination. *Tarantino* judicially declared a rule of immunity for statements made by a defendant to a mental health professional during a competency examination: "[N]either the statements of [the defendant] to the psychiatrists appointed under section 1369 nor the fruits of such statements may be used in trial of the issue of [the defendant's] guilt, under either the plea of not guilty or that of not guilty by reason of insanity." (*Id.* at p. 470.)

Six years later, in *Estelle v. Smith* (1981) 451 U.S. 454 [68 L.Ed.2d 359, 101 S.Ct. 1866] (*Estelle*), the United States Supreme Court held that a "criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding" unless the defendant had been informed of and waived his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*). (*Estelle, supra,* 451 U.S. at pp. 468–469.) If the defendant invokes his rights and refuses to answer questions of the mental health professional conducting the competency examination, "the validly ordered competency examination nevertheless could . . . proceed[] upon the condition that the results would be applied solely for that purpose," that is, solely for the purpose of the competency examination. (*Id.* at p. 469.)

The next year, this court in *People v. Arcega* (1982) 32 Cal.3d 504, 522 [186 Cal.Rptr. 94, 651 P.2d 338], adopted the immunity rule the Court of Appeal had articulated in *Tarantino, supra,* 48 Cal.App.3d at page 470. Immunity is necessary, we said, to "ensure that an accused is not convicted by use of his own statements made at a court-compelled examination," and to foster "honesty and lack of restraint on the accused's part at the examination and thus promote[s] accuracy in the psychiatric evaluation." (*People v. Arcega, supra,* 32 Cal.3d at p. 522; see *People v. Weaver* (2001) 26 Cal.4th 876, 960 [111 Cal.Rptr.2d 2, 29 P.3d 103].)

■ Those decisions establish that the Fifth Amendment's privilege against self-incrimination applies to competency examinations, and therefore a defendant's statements made during such an examination may not be used by the prosecution to prove its case-in-chief as to either guilt or penalty. But those decisions do not directly answer the question presented here: May statements a defendant has made during a court-initiated mental competency examination later be used to *impeach* the defendant if he or she testifies at trial?

A number of decisions have held that notwithstanding the existence of a constitutional or other legal impediment barring the prosecution from introducing certain evidence to establish a defendant's guilt, the evidence may be used to impeach a testifying defendant. (See, e.g., *Harris v. New York* (1971) 401 U.S. 222, 225 [28 L.Ed.2d 1, 91 S.Ct. 643] [statements obtained in violation of *Miranda*]; *Walder v. United States* (1954) 347 U.S. 62, 65 [98 L.Ed. 503, 74 S.Ct. 354] [evidence obtained in violation of the Fourth Amendment]; *People v. May* (1988) 44 Cal.3d 309, 315 [243 Cal.Rptr. 369, 748 P.2d 307] (*May*) [statements obtained in violation of *Miranda*]; *People v. Coleman* (1975) 13 Cal.3d 867, 889 [120 Cal.Rptr. 384, 533 P.2d 1024] [probationer's testimony at probation revocation hearing]; *People v. Crow* (1994) 28 Cal.App.4th 440, 452 [33 Cal.Rptr.2d 624] [statements made during plea negotiations].)

Defendant here distinguishes those cases, asserting that, unlike his case, the defendant's statements in each of those cases were not "legislatively compelled." Statements that are legislatively compelled, defendant argues, implicate the Fifth Amendment's privilege against self-incrimination. In support, defendant cites the United States Supreme Court's decision in *New Jersey v. Portash* (1979) 440 U.S. 450 [59 L.Ed.2d 501, 99 S.Ct. 1292] (*Portash*), and this court's decisions in *May, supra,* 44 Cal.3d 309, and *People v. Macias* (1997) 16 Cal.4th 739 [66 Cal.Rptr.2d 659, 941 P.2d 838] (*Macias*). We summarize those cases below.

In *Portash,* the defendant, who was a public employee, testified before a New Jersey grand jury. A New Jersey statute provided that the testimony of a public employee before a grand jury " 'shall not be used against such public employee in a subsequent criminal proceeding . . . .' " (*Portash, supra,* 440 U.S. at p. 452, fn. 1.) At the defendant's later trial for extortion, the trial court ruled that the prosecution could use the defendant's grand jury testimony to impeach him if he testified at trial. The defendant chose not to testify.

The United States Supreme Court in *Portash* said that "[t]estimony given in response to a grant of legislative immunity is the essence of coerced testimony." (*Portash, supra,* 440 U.S. at p. 459.) Observing that the "witness is told to talk or face the government's coercive sanctions, notably, a conviction for contempt," the court held that the defendant's statements before the grand jury were compulsory and therefore inadmissible for impeachment. (*Ibid.*) The court found a "crucial distinction" between statements made in that situation and statements obtained in violation of *Miranda* warnings, explaining that statements taken in violation of *Miranda* are not coerced or involuntary and that judicial decisions allowing their use to impeach a defendant's testimony at trial (*Oregon v. Hass* (1975) 420 U.S. 714 [43 L.Ed.2d 570, 95 S.Ct. 1215]; *Harris v. New York, supra,* 401 U.S. 222) were based on balancing the competing interests of deterring unlawful police conduct and the need to prevent perjury in testimony. (*Portash, supra,* 440 U.S. at pp. 458–459.)

With respect to this court's decision in *May, supra,* 44 Cal.3d at page 311, we there concluded that the California electorate's passage of Proposition 8, through its "Truth-in-Evidence" provision (Cal. Const., art. I, § 28, subd. (d)), abrogated our prior decision in *People v. Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272], which had held that a defendant's statements obtained in violation of *Miranda v. Arizona, supra,* 384 U.S. 436, were inadmissible for impeachment. Citing the United States Supreme Court's contrary holding in *Harris v. New York, supra,* 401 U.S. 222 (voluntary statements obtained in violation of *Miranda* are admissible to impeach a testifying defendant), we held in *May* that, in light of Proposition 8, the high court's decision in *Harris v. New York* must be followed in California. (*May, supra,* 44 Cal.3d at pp. 311, 318.) Thereafter, citing *Portash, supra,* 440 U.S. 450, this court in *May* observed that "[l]egislatively compelled testimony [cannot] be used against the testifier for any purpose under the federal Constitution" (*May, supra,* 44 Cal.3d at p. 317).

As to our decision in *Macias, supra,* 16 Cal.4th 739, there a majority of this court concluded that a minor defendant's statements to a probation officer in an interview in preparation for a hearing to determine whether the minor

should be tried as an adult were not compelled and therefore could be used for impeachment, as there was no violation of the juvenile's privilege against self-incrimination. (*Id.* at p. 756 (plur. opn. of Chin, J.); *id.* at p. 757 (conc. opn. of Baxter, J.); see also *People v. Humiston* (1993) 20 Cal.App.4th 460, 472–476 [24 Cal.Rptr.2d 515].) The plurality pointed out that no statute required the minor to speak to the probation officer, that the minor had alternative methods of providing mitigating evidence to the probation officer, that the minor's statements were generally made with counsel present, and that a probation officer is less likely to overreach in a fitness interview than a police officer in a custodial setting. (*Macias, supra,* 16 Cal.4th at pp. 752, 756.) Turning to the high court's decision in *Portash, supra,* 440 U.S. 450, the *Macias* plurality observed: "*Portash* forbids the use in any criminal trial of *involuntary* statements that a defendant gave following a use immunity grant. But we do not believe *Portash* prohibits the limited use of statements made to a probation officer in preparation for a juvenile fitness hearing to impeach the same minor defendant's voluntary, inconsistent trial statements." (*Macias, supra,* 16 Cal.4th at p. 754.) The *Macias* plurality went on to note that the high court itself "has recognized that *Portash* was a unique and limited case" involving coerced testimony, because there the witness was ordered to testify or face contempt sanctions. (*Id.* at pp. 754–755.) The *Macias* plurality then cited the high court's decision in *South Dakota v. Neville* (1983) 459 U.S. 553, 563–564 [74 L.Ed.2d 748, 103 S.Ct. 916], for the proposition that a defendant's decision whether to take a blood-alcohol test was not legislatively compelled unless the defendant "could show that the consequences of his decision either to submit or to refuse the request were so severe as to remove effectively his free will to choose." (*Macias, supra,* 16 Cal.4th at p. 755.) The *Macias* plurality also cited the high court's decision in *Minnesota v. Murphy* (1984) 465 U.S. 420, 431–435 [79 L.Ed.2d 409, 104 S.Ct. 1136], which stated that a probationary defendant's obligation to answer questions from his probation officer truthfully did not convert the answers into compelled statements. (*Macias, supra,* 16 Cal.4th at p. 755.)

Defendant here is right that compelled statements may not be used by the prosecution for any purpose. (*Portash, supra,* 440 U.S. at p. 459.) But defendant is wrong insofar as he assumes that whenever a procedure is legislatively required, any statements made in that context are compelled and therefore any use of them by the prosecution would violate the Fifth Amendment's privilege against self-incrimination.

Statements a defendant makes during a competency examination under the statutory procedure the Legislature established in sections 1368 and 1369 are in some respects similar to but in other respects different from those at issue in the high court's decision in *Portash, supra,* 440 U.S. 450, and in this court's decision in *Macias, supra,* 16 Cal.4th 739, as we explain below.

The statutory procedure at issue here is similar to that involved in *Portash, supra,* 440 U.S. 450, in that both require the defendant to submit to an examination, here a mental competency examination and in *Portash* a grand jury examination. But unlike the New Jersey statute in *Portash,* which compelled the witness to testify before the grand jury (*Portash, supra,* 440 U.S. at p. 452, fn. 1), the statements a defendant makes in a mental competency examination are not compelled. Although under our statutory scheme a defendant must submit to a court-initiated competency evaluation, there is no compulsion to make any statements. The parties have not cited, nor has our research disclosed, the existence of any legal sanction against a defendant who refuses to speak to, or cooperate with, the court-appointed mental health experts. (See *People v. Harris, supra,* 192 Cal.App.3d at pp. 946–947 [competency trial held after the defendant's refusal to be interviewed by mental health professionals]; *Tarantino, supra,* 48 Cal.App.3d at pp. 468, 471 [contempt order for refusing to be examined without counsel present permanently stayed].)[2] Thus, under our statutory scheme any statement a defendant makes during the mental competency evaluation is not compelled, legislatively or otherwise.

With respect to this court's decision in *Macias, supra,* 16 Cal.4th 739, which concerned statements of a minor to a probation officer in preparation for a hearing to determine the minor's fitness to stand trial as an adult, there, as here, no legal sanction attached to a refusal to make any statements during the procedure at issue. But, unlike the interview with the probation officer in *Macias,* a defendant in a court-initiated mental competency evaluation must submit to such an examination. (*Centeno v. Superior Court, supra,* 117 Cal.App.4th at p. 43.)

■  Our conclusion that a defendant's statements made at a mental competency evaluation are not legislatively or otherwise compelled and therefore not per se inadmissible for any purposes under the high court's decision in *Portash, supra,* 440 U.S. 450, does not end the inquiry of whether they may be used to impeach a defendant's testimony at trial. As mentioned earlier, a defendant's statements at a mental competency examination cannot be used later by the prosecution to prove its case-in-chief as to either guilt or penalty. (*Estelle, supra,* 451 U.S. at pp. 468–469; *People v. Weaver, supra,* 26 Cal.4th at pp. 959–960.) Where the United States Supreme Court has permitted impeachment of a testifying defendant with statements inadmissible to prove guilt, the court has used a test that balances the policy supporting the

---

[2] The threat of any sanction such as contempt against a defendant for refusing to answer questions of the mental health experts during a competency examination would render the statements made at that examination compelled. In that event, under *Portash, supra,* 440 U.S. at page 459, the statements could not be used for any purpose at trial.

exclusion of such statements to prove guilt against the policy not to countenance perjury. (*Portash, supra,* 440 U.S. at p. 458 [incremental deterrence of police illegality weighed against policy against perjury]; see *James v. Illinois* (1990) 493 U.S. 307, 316–317 [107 L.Ed.2d 676, 110 S.Ct. 648] [potential chill of truth-seeking process by allowing impeachment found to outweigh loss of probative testimony]; *United States v. Havens* (1980) 446 U.S. 620, 627 [64 L.Ed.2d 559, 100 S.Ct. 1912] [competing interests of exclusionary rule in discouraging police misconduct and impairment of factfinding goal of trial assessed]; *Harris v. New York, supra,* 401 U.S. at p. 225 [introduction of reliable evidence to impeach found to further truth-seeking function of trial, while likelihood of encouraging police misconduct considered only speculative possibility].)

Here, we must balance the policy interest in deterring and exposing perjury against the policy interest in preserving and enhancing the reliability of mental competency evaluations.

The policy against countenancing perjury is strong. (*Portash, supra,* 440 U.S. at p. 458.) Allowing false testimony to go unchallenged impairs the integrity of the factfinding objective of a trial (*United States v. Havens, supra,* 446 U.S. at p. 627), because such testimony hinders or blocks the disclosure of the truth to the trier of fact (see *James v. Illinois, supra,* 493 U.S. at p. 321).

Just as strong, however, is the policy against trying persons who are mentally incompetent. In the words of the United States Supreme Court: " 'Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.' " (*Cooper v. Oklahoma* (1996) 517 U.S. 348, 354 [134 L.Ed.2d 498, 116 S.Ct. 1373].)

The policy that a mentally incompetent person not be subjected to a trial has its roots in our constitutional, statutory, and common law. It is thus a policy of ancient and venerable origin, founded on the view that to subject the mentally incompetent to trial or to punishment is inhumane and cruel. (*Cooper v. Oklahoma, supra,* 517 U.S. at p. 356; *People v. Perry, supra,* 14 Cal.2d at pp. 397–399.)[3] The "sole purpose of [competency proceedings] 'is

---

[3] Blackstone's Commentaries demonstrate the historical underpinnings of the policy against subjecting a mentally incompetent person to trial. " 'Indeed, in the bloody reign of Henry the Eighth, a statute was made, which enacted that if a person, being *compos mentis* (of sane mind) should commit high treason, and after fall into madness, he might be tried in his absence, and should suffer death, as if he were of perfect memory. But this savage and

the humanitarian desire to assure that one who is mentally unable to defend himself not be tried upon a criminal charge.' " (*People v. Harris, supra,* 192 Cal.App.3d at pp. 949–950.)

A mental competency evaluation seeks to ascertain the defendant's ability "to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).) It therefore is ordered only when there is a legitimate concern that the defendant may be substantially mentally impaired.

Unlike those instances where otherwise inadmissible statements are allowed to impeach a testifying defendant (e.g., *Macias, supra,* 16 Cal.4th at pp. 755–756 [juvenile's statements during probation officer's interview in preparation for hearing to determine whether the juvenile should be tried as an adult]; *People v. Coleman, supra,* 13 Cal.3d at p. 889 [probationer's statements at probation revocation hearing]; *People v. Drews* (1989) 208 Cal.App.3d 1317, 1325–1326 [256 Cal.Rptr. 846] [defendant's testimony at pretrial hearing on motion to suppress evidence]), during a mental competency examination a defendant does not have the benefit of the presence of counsel. Indeed, unlike situations where the presence of counsel may contribute to the purpose of the proceeding, such as the inquiry into a juvenile's behavioral patterns and social history to determine whether the juvenile should be tried as an adult (*Macias, supra,* 16 Cal.4th at pp. 747, 756), the presence of counsel during a competency examination by mental health professionals may undermine the usefulness of the examination, making it more difficult for the expert examining the defendant to determine whether the defendant is competent. (See *Estelle, supra,* 451 U.S. at p. 470, fn. 14 [" 'an attorney present during the psychiatric interview could contribute little and might seriously disrupt the examination' "]; *Tarantino, supra,* 48 Cal.App.3d at p. 468 [psychiatrists refused to conduct competency examination with defense attorney present].)

Also, determining a defendant's mental competency requires an assessment of the defendant's ability to understand the nature of the proceedings and to assist counsel in conducting a defense. (§ 1367, subd. (a).) To make this assessment, the mental health expert will want to evaluate the defendant's ability to discuss the facts of the case, even though the defendant's guilt of the offense charged is not relevant to the inquiry. (See *People v. Harris, supra,* 192 Cal.App.3d at pp. 949–950; *Tarantino, supra,* 48 Cal.App.3d at p. 469.)

inhuman law was repealed by the statute 1 and 2 P. and M., c. 10.' " (*People v. Perry, supra,* 14 Cal.2d at p. 398, quoting 4 Blackstone's Commentaries 25.)

If a defendant's statements during the examination could later be used to impeach the defendant during the criminal trial, the defendant would have a strong incentive not to be forthcoming during the examination, thus undermining the reliability of the competency determination.

A rule allowing a defendant to be impeached at trial with statements made during a competency examination would pose a dilemma for defendant's trial attorney. A competency examination occurs after the right to counsel has attached, at a critical stage of the proceeding at which counsel's participation is constitutionally mandated; the examination cannot be conducted without "the assistance of [defendant's] attorneys in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed." (*Estelle, supra,* 451 U.S. at pp. 470–471.) Counsel would need to explain the risk of impeachment to the possibly mentally impaired defendant and, if that risk was sufficiently grave, might be ethically bound to advise the defendant not to communicate with the court-appointed mental health professionals at all during the examination.

The prosecution's ability to conduct its own mental evaluation would also be placed in jeopardy. A defendant may be compelled to submit to competency examinations by prosecution experts (*Baqleh v. Superior Court, supra,* 100 Cal.App.4th at pp. 505–506), but only if the defendant's statements during the examination are inadmissible for any purpose at trial (*id.* at pp. 498–499 & fn. 5, 502). If a defendant's statements during a competency examination could later be used against him for impeachment at trial, the trial court could not impose any sanctions on a defendant who refused to submit to an examination by prosecution experts. As we have observed (see fn. 2, *ante*), the threat of sanctions for refusing to speak would make the defendant's statements compelled, and the defendant then would have the right to refuse to participate by invoking the Fifth Amendment privilege against self-incrimination. (*Portash, supra,* 440 U.S. at p. 459 ["defendant's compelled statements . . . may not be put to any testimonial use whatever against him in a criminal trial"]; *Estelle, supra,* 451 U.S. at p. 469.)

Thus, allowing a defendant's statements during a competency evaluation to be used for impeachment at trial would seriously impair the mental health expert's ability to accurately assess the defendant's mental competency, because the defendant would likely be unwilling to freely discuss the facts of the crime and might well refuse to speak at all. Impairment of the examination process in turn would seriously compromise the trial court's ability to fulfill its constitutional and statutory obligation to determine whether a defendant is competent to stand trial.

Against this very substantial impairment of the state's interest in accurately determining whether criminal defendants are mentally competent to stand trial, we must weigh the risk to the truth-seeking function if the prosecution is precluded from impeaching the defendant at trial with inconsistent statements made during competency evaluations. A mental competency evaluation is concerned with the defendant's ability to understand the proceeding and assist counsel, and not with the defendant's guilt of the offense charged. Therefore, a defendant's statements to the mental health professional are made for a purpose unrelated to the validity of the criminal charge, and in any event those statements may be consistent with the defendant's later testimony at trial. Moreover, minor inconsistencies may be attributed to the defendant's mental impairments that prompted the competency inquiry. In short, the frequency and utility of impeachment at trial with a defendant's inconsistent statements during a competency examination is speculative.

■ Having considered and weighed the competing interests, we conclude that the impairment of the mental competency evaluation process if impeachment is permitted outweighs the speculative risk to the truth-seeking function of the criminal trial if impeachment is denied.[4] Accordingly, we conclude that the Fifth Amendment's privilege against self-incrimination prohibits the prosecution from using at trial, for the purpose of impeachment, statements a defendant has made during a court-ordered mental competency examination.[5]

We have considered, but rejected as impractical, an alternate route to essentially the same result. Instead of simply disallowing impeachment at

---

[4] To the extent it is inconsistent with the views expressed herein, *People v. Stanfill, supra,* 184 Cal.App.3d 577, is disapproved.

[5] The concurring and dissenting opinion of Justice Werdegar asserts that the immunity at issue arises from California statutory law, not federal law. From this premise it argues that our decision here should not be founded upon the federal Constitution's Fifth Amendment privilege against self-incrimination. That view is untenable.

The rule of immunity was first *judicially* declared in *Tarantino, supra,* 48 Cal.App.3d at page 469. As this court observed in *People v. Arcega, supra,* 32 Cal.3d at page 522, "the basis for the *Tarantino* decision was the constitutional privilege against self-incrimination." (See, e.g., *People v. Jablonski* (2006) 37 Cal.4th 774, 802–803 [38 Cal.Rptr.3d 98, 126 P.3d 938] [judicially declared immunity and Fifth Amendment coextensive]; *People v. Weaver, supra,* 26 Cal.4th at p. 960 ["the rule of immunity 'is necessary to ensure that an accused is not convicted by use of his own statements made at a court-compelled examination' "].) The concurring and dissenting opinion of Justice Werdegar thus errs in asserting that the judicially declared immunity rule at issue here is based on statutory law.

That approach may also violate the "Truth-in-Evidence" provision of the California Constitution. (Cal. Const., art. I, § 28, subd. (d); see *Macias, supra,* 16 Cal.4th 739; *May, supra,* 44 Cal.3d 309; *Ramona R. v. Superior Court* (1985) 37 Cal.3d 802 [210 Cal.Rptr. 204, 693 P.2d 789].) Because defendant does not claim that there is a statutory rule of immunity that prohibited the prosecution from using defendant's statements to a mental health professional during an examination to determine his competency to stand trial for purposes of impeachment, we need not address this question.

trial with a defendant's statements during a competency examination, we could require trial courts to advise the defendant, before the competency examination, of the right to counsel and the right to remain silent. (See *Estelle, supra,* 451 U.S. at p. 468.) If the defendant invoked those rights, the court could nevertheless order the competency examination to proceed, but any statements the defendant made during the examination could then be used only for the purpose of determining competency. (*Ibid.*; see fn. 2, *ante.*) Acting on the advice of counsel, defendants would, we confidently predict, routinely invoke their rights, and thus the end result would be the same—the defendant's statements during the competency examination would be inadmissible for impeachment at trial. Because we see no advantage in these additional procedural steps, we adopt the more direct approach. Moreover, we are reluctant to place our trial courts in the awkward position of advising defendants of their rights to counsel and to remain silent, and then, after the defendants invoke those rights, ordering the defendants to participate in the evaluation and informing them they cannot remain silent.

Our resolution of the issue before us fully protects both a defendant's Fifth Amendment privilege against self-incrimination and a defendant's Sixth Amendment right to counsel because the use immunity recognized here adequately safeguards those rights. (*Baqleh v. Superior Court, supra,* 100 Cal.App.4th at pp. 502–503.) Accordingly, we need not resolve here the difficult question whether counsel would have a right to be present at a court-ordered competency examination if a defendant's statements during such an examination could later be used against him. Nor need we determine here whether statements obtained in violation of the right to counsel may be used to impeach a testifying defendant. (See *United States v. Ortega* (9th Cir. 2000) 203 F.3d 675 [statements may be used to impeach]; *United States v. Brown* (2d Cir. 1983) 699 F.2d 585 [statements may not be used to impeach]; *People v. Brown* (1996) 42 Cal.App.4th 461 [49 Cal.Rptr.2d 652] [statements may be used to impeach]; *People v. Harper* (1991) 228 Cal.App.3d 843 [279 Cal.Rptr. 204] [statements may not be used to impeach].)

■ The use of statements that defendant made during his mental competency evaluation to impeach his testimony at trial violated defendant's constitutional right not to incriminate himself. Whether that error prejudiced defendant is explored below.

### III

Under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824], a violation of a criminal defendant's federal constitutional rights requires reversal of the judgment unless the reviewing court determines "beyond a reasonable doubt that the error complained of did not contribute to

the verdict." Applying this standard here, we agree with the Court of Appeal that the violation of defendant's Fifth Amendment privilege not to incriminate himself did not prejudice defendant.

The evidence against defendant was overwhelming. The bullet fragment taken from one of the victims' cars matched not only the shell casings found at defendant's home, but also his rifle. Also, defendant was seen holding his rifle at the time of the car shootings.

The extent of defendant's impeachment at trial with statements he made at his mental health evaluation was minimal. Whether, as defendant told Dr. Pai, he drank one or two cans of beer on the day of the shootings was of little probative value at trial. There was no allegation that alcohol consumption played any part in the car shootings, and the jury was aware that there was no alcohol in the sample of defendant's blood drawn two hours after his arrest. The prosecution's impeachment of defendant with his statement to Dr. Pai, made at the mental competency examination, that he usually got along with Joyce Muse was minimal. It was undermined by defendant's trial testimony on redirect examination that Muse was intimidating when she was arguing with her parents or with a boyfriend but that she was otherwise congenial.

Dr. Caruso's testimony that defendant told him at the mental competency evaluation that he knew the shots fired at the cars came from his property at a time when defendant claimed he was shooting at blue jays, is largely cumulative of testimony by one of the sheriff's deputies. Deputy Sheriff Ronald Smith testified that defendant admitted he was the man they were looking for, that Joyce Muse thought defendant had been shooting at her, and that he had been shooting at blue jays by his house.

In view of the overwhelming evidence of guilt and the insignificant nature of defendant's mental competence examination statements later used by the prosecution to impeach him, we conclude that, beyond a reasonable doubt, the error in allowing such impeachment did not contribute to the verdict. (*Chapman v. California, supra,* 386 U.S. at p. 24.)

DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Chin, J., and Moreno, J., concurred.

**BAXTER, J.,** Concurring and Dissenting.—I concur in the judgment of affirmance, and in the majority's conclusion that any error in allowing use of defendant's statements to court-appointed competency examiners to impeach

his trial testimony was harmless by any standard. But I must dissent from the majority's determination that error occurred when the prosecution was allowed to impeach defendant's testimony in this fashion.

The majority holds that, even though a defendant is not *compelled* by California law to speak to court-appointed competency examiners, but does so, is adjudged competent, later elects to testify in his own behalf at his criminal trial, and takes that opportunity to tell the court something different than what he previously told the examiners, it is a violation of the Fifth Amendment of the United States Constitution to use his earlier statements to impeach his testimonial credibility. Moreover, the majority insinuates, the Sixth Amendment may compel a similar result to the extent the defendant's counsel was not permitted to *attend* the competency examination itself. I cannot agree.

At the outset, as Justice Werdegar observes, although California's judicially declared "blanket use immunity" for statements made in a court-ordered competency examination is designed in part to protect the privilege against self-incrimination, it is a creature of state, not federal, law. (*Tarantino v. Superior Court* (1975) 48 Cal.App.3d 465, 469–470 [122 Cal.Rptr. 61] (*Tarantino*); see *People v. Arcega* (1982) 32 Cal.3d 504, 521–523 [186 Cal.Rptr. 94, 651 P.2d 338] (*Arcega*); cf. *Centeno v. Superior Court* (2004) 117 Cal.App.4th 30, 43–44 [11 Cal.Rptr.3d 533].) *Tarantino* characterized the immunity as one "reasonably to be implied from the [statutory] provisions [for determining competency]" (*Tarantino, supra,* at p. 469), and it has never been squarely premised on the federal Constitution. It has survived the truth-in-evidence provisions of Proposition 8 (see *Arcega, supra,* at pp. 521–523), presumably under that measure's express preservation of "existing statutory rule[s] of evidence relating to privilege" (Cal. Const., art. I, § 28, subd. (d); see Evid. Code, § 940; *Ramona R. v. Superior Court* (1985) 37 Cal.3d 802, 807–808 [210 Cal.Rptr. 204, 693 P.2d 789] (*Ramona R.*); see also conc. & dis. opn. of Werdegar, J., *post,* at pp. 1266–1269, & fns. 3, 4).

Though I would not do so for reasons discussed below, I therefore assume, as Justice Werdegar concludes, that we could now construe this "existing" state-privilege-related immunity to include protection against use for impeachment. (Cf. *People v. Macias* (1997) 16 Cal.4th 739, 751–753 [66 Cal.Rptr.2d 659, 941 P.2d 838] (*Macias*).) In that event, reversible prejudice would presumably be measured by the standard applicable to errors of state law. (See *People v. Cahill* (1993) 5 Cal.4th 478, 487–510 [20 Cal.Rptr.2d 582, 853 P.2d 1037]; *People v. Watson* (1956) 46 Cal.2d 818, 835 [299 P.2d 243].)

However, by rejecting this option, and placing its ruling squarely on federal constitutional grounds, the majority locks in the more stringent standard of reversibility set forth in *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. The majority's constitutional ruling is unnecessary and incorrect.

Even where federal constitutional principles preclude *substantive* use of an accused's statements to prove his criminal guilt, the United States Supreme Court has stressed that it has denied *impeachment* use of such statements in only one instance—where the statements were truly *involuntary*. (*Michigan v. Harvey* (1989) 494 U.S. 344, 351 [108 L.Ed.2d 293, 110 S.Ct. 1176] (*Harvey*), citing, as examples, *New Jersey v. Portash* (1979) 440 U.S. 450 [59 L.Ed.2d 501, 99 S.Ct. 1292] (*Portash*) [grand jury testimony under statutory grant of use immunity, but subject to threat of contempt for refusal to talk]; *Mincey v. Arizona* (1978) 437 U.S. 385 [57 L.Ed.2d 290, 98 S.Ct. 2408] [statements extracted over protests of seriously wounded suspect in hospital intensive care unit].)

If no true coercion or compulsion is involved, both the high court and the courts of this state have held that, even when an accused's statements in a particular context are inadmissible to prove he committed a crime, they are available to impeach him if he voluntarily testifies at the trial on criminal charges or allegations. (E.g., *Harvey, supra,* 494 U.S. 344, 348–354 [voluntary statements elicited by police-initiated conversation with custodial defendant who had previously invoked Sixth Amendment right to counsel]; *Oregon v. Hass* (1975) 420 U.S. 714, 720–724 [43 L.Ed.2d 570, 95 S.Ct. 1215] [voluntary statements obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]]; *Harris v. New York* (1971) 401 U.S. 222, 224–226 [28 L.Ed.2d 1, 91 S.Ct. 643] (*Harris*) [same]; *People v. Peevy* (1998) 17 Cal.4th 1184, 1191–1208 [73 Cal.Rptr.2d 865, 953 P.2d 1212] [voluntary statements elicited in deliberate violation of *Miranda*]; *People v. Coleman* (1975) 13 Cal.3d 867, 892 [120 Cal.Rptr. 384, 533 P.2d 1024] [inconsistent statements at probation revocation hearing]; *People v. Crow* (1994) 28 Cal.App.4th 440, 449–453 [33 Cal.Rptr.2d 624] [prior inconsistent statements during unsuccessful plea negotiations]; *People v. Drews* (1989) 208 Cal.App.3d 1317, 1324–1326 [256 Cal.Rptr. 846] [prior inconsistent statements during pretrial suppression hearing]; *People v. Stanfill* (1986) 184 Cal.App.3d 577, 581–582 [229 Cal.Rptr. 215] (*Stanfill*) [prior inconsistent statements to court-appointed competency examiners]; *Sheila O. v. Superior Court* (1981) 125 Cal.App.3d 812, 816–817 [178 Cal.Rptr. 418] [juvenile's testimony at fitness hearing]; cf. *United States v. Havens* (1980) 446 U.S. 620,

624–628 [64 L.Ed.2d 559, 100 S.Ct. 1912] [physical evidence obtained in violation of Fourth Amendment]; but see *Baqleh v. Superior Court* (2002) 100 Cal.App.4th 478, 499, fn. 5 [122 Cal.Rptr.2d 673] *(Baqleh)* [statements to competency examiners not available for impeachment]; *People v. Harris* (1987) 192 Cal.App.3d 943, 949–950 [237 Cal.Rptr. 747] [same].)

Whether substantive use protection is granted to protect constitutional rights, or to encourage the accused to speak the truth in a particular nontrial setting, or both, modern California and high court cases have emphasized that these considerations *do not give the accused a license to commit perjury on the witness stand.* In this regard, the United States Supreme Court has noted that "[e]very criminal defendant is privileged to testify in his own defense, or to refuse to do so. But . . . [h]aving *voluntarily taken the stand*, [the accused is] under an obligation to [testify] truthfully and accurately," and by impeaching him with his prior inconsistent statements, "the prosecution [does] no more than utilize the traditional truth-testing devices of the adversary process." *(Harris, supra,* 401 U.S. 222, 225, italics added.)

In *Macias, supra,* 16 Cal.4th 739, we considered a question similar to that which confronts us here. *Macias* addressed California's long-standing judicial use immunity for a juvenile's statements to a probation officer evaluating whether the minor is fit for treatment within the juvenile system or instead must be tried as an adult (see *Ramona R., supra,* 37 Cal.3d 802). The issue was whether this immunity extended to use of such statements to impeach the minor's testimony at his subsequent adult criminal trial. A majority of this court concluded that the answer is "no."

*Ramona R.* had determined that although the minor was not statutorily compelled to speak to the probation officer, use immunity was essential to protect the juvenile's California right not to incriminate herself. Otherwise, *Ramona R.* reasoned, the minor would be forced to choose between cooperating fully with the probation officer, thereby obtaining fair treatment at the fitness hearing, or remaining silent, thus preserving her privilege against self-incrimination. As *Ramona R.* observed, the juvenile's lack of communication could be used against her in the fitness determination—especially when, as in the murder case there at issue, the burden of proving fitness for juvenile treatment was on her—and "the certification of a juvenile offender to an adult court has been accurately characterized as 'the worst punishment the juvenile system is empowered to inflict.' [Citation.]" *(Ramona R., supra,* 37 Cal.3d 803, 810.) "Hence, we concluded [in *Ramona R.*] that the consequences of deciding between silence and incrimination are so severe that they warrant substantive use immunity for statements the minor makes in preparation for a fitness hearing. [Citation.]" *(Macias, supra,* 16 Cal.4th 739, 750.)

As the plurality opinion in *Macias* explained, "[t]he purpose of the *Ramona R.* use immunity is to encourage the minor to give the probation officer candid and unencumbered evidence to aid the officer's—and ultimately the court's—determination of the best forum to consider the case. [Citation.] The grant of immunity also avoids the risk that the prosecution might take unfair advantage of an admission or silence by using it against the minor at a subsequent trial. [Citation.] In other words, substantive use immunity allows juveniles to exercise their right to present mitigating evidence to probation officers without giving prosecutors in subsequent trials the unfair advantage of using their statements as substantive evidence of guilt. [Citation.]" (*Macias, supra*, 16 Cal.4th 739, 752–753.)

However, the plurality opinion in *Macias* concluded, "we can easily distinguish the prosecution's use for impeachment purposes of a juvenile's statements made to a probation officer determining fitness from the use of those statements as substantive evidence of guilt. . . . [N]othing in the state Constitution or our judicial decisions protects juveniles from impeachment *if their voluntary trial testimony is inconsistent* with the substantively immunized statements they made to their probation officers before their fitness hearings." (*Macias, supra*, 16 Cal.4th 739, 753, italics added.)

As part of its analysis, the plurality opinion in *Macias* traced the history of California's pre-Proposition 8 rule which, contrary to United States Supreme Court decisions addressing the federal Constitution, had precluded even the impeachment use of statements obtained in violation of *Miranda*. (See *People v. Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272]; cf. *Harris, supra*, 401 U.S. 222.) As the *Macias* plurality opinion explained, we concluded after Proposition 8 that the truth-in-evidence provisions of that initiative measure had abrogated the *Disbrow* ruling and required California's adherence to *Harris*. (*People v. May* (1988) 44 Cal.3d 309 [243 Cal.Rptr. 369, 748 P.2d 307].) In this regard, the *Macias* plurality opinion stressed *May*'s observation that "the 'federal rule announced in *Harris* . . . , allowing impeachment by the defendant's prior statements taken in violation of *Miranda*, may have been based on the premise that the privilege against self-incrimination *cannot be invoked by one who has voluntarily taken the witness stand to testify concerning the subject matter of his prior statement*. [Citations.]' " (*Macias, supra*, 16 Cal.4th 739, 752, quoting *May, supra*, 44 Cal.3d 309, 319, italics added; see also *Stanfill, supra*, 184 Cal.App.3d 577, 581–582.)

*Macias* also expressly distinguished and limited *Portash, supra*, 440 U.S. 450, which had held that "legislatively compelled" testimony at a grand jury proceeding, given pursuant to a statutory use immunity but under threat of contempt for any refusal to testify, could not be used against the witness for

any criminal purpose, including impeachment. As *Macias* explained, "[w]e agree . . . that *Portash* forbids the use in any criminal trial of *involuntary* statements that a defendant gave following a use immunity grant. But we do not believe *Portash* prohibits the limited use of statements [voluntarily] made to a probation officer in preparation for a juvenile fitness hearing to impeach the same minor defendant's voluntary, inconsistent trial statements. [¶] The United States Supreme Court has recognized that *Portash* was a unique and limited case, demonstrating the essence of coerced testimony in the 'classic Fifth Amendment' sense because a witness who had been given use immunity was later ordered to testify or face contempt sanctions. [Citation.]" (*Macias, supra,* 16 Cal.4th 739, 754–755.)[1]

This case cannot be distinguished from *Macias* in any material way. In each instance, California has recognized a use immunity for statements made by a criminal accused in a particular proceeding—one not intended to obtain evidence of criminal guilt—in order to encourage the accused to speak, and to do so candidly and truthfully, for purposes of the proceeding at issue, without compromising the privilege against self-incrimination. Yet California law does not *compel* the accused to speak in either situation. Thus, protection of state and federal self-incrimination principles does not require that the prohibition on *substantive* use of the accused's *voluntary* statements be extended to use for impeachment. Here, as in *Macias,* when the accused later *voluntarily* takes the stand and *changes* his story, the prosecution must be permitted to challenge his credibility by bringing to light his inconsistent prior statements.

In its attempt to distinguish *Macias,* the majority purports to apply a balance-of-interests test, concluding that the balance must be struck differently here than in *Macias.* The majority stresses the importance of the constitutional right not to be tried while incompetent, the concomitant need for reliability in the competency evaluation, and the resulting strength of the policy that the examinee not be discouraged by self-incrimination concerns

---

[1] As *Macias* observed, the high court had declined to apply *Portash* in two later decisions, *South Dakota v. Neville* (1983) 459 U.S. 553 [74 L.Ed.2d 748, 103 S.Ct. 916], and *Minnesota v. Murphy* (1984) 465 U.S. 420 [79 L.Ed.2d 409, 104 S.Ct. 1136]. In *Neville,* the court held that the defendant's decision whether to submit to a blood-alcohol test was not "legislatively compelled" in the *Portash* sense unless he could show that the consequences of his decision either to submit or to refuse the request were so severe as to remove effectively his free will to choose. (*Neville, supra,* at p. 562.) In *Murphy,* a probationer was under a court order to meet with his probation officer and respond truthfully to the officer's questions. Nonetheless, the United States Supreme Court held that statements he volunteered to the officer were not "compelled," and were thus admissible in his criminal trial, even though the officer did not advise him of his privilege against self-incrimination and threatened to revoke probation if he lied. (*Murphy, supra,* at p. 440.)

from responding to the examiners' questions. The majority observes in particular that, unlike the juvenile fitness evaluation procedure at issue in *Macias*, which "provides . . . alternatives . . . for producing any mitigating evidence that would rebut the fitness presumption" (*Macias, supra,* 16 Cal.4th 739, 752), a reliable competency evaluation requires a direct examination of the accused, in which candid and truthful answers to examiners' questions are crucial.[2] Finally, the majority notes that, in a juvenile fitness evaluation, the minor's counsel may be present at any interview of the minor by the probation officer, while counsel may be excluded from a competency examination.

But nothing in these suggested distinctions demonstrates that we should interpret the Fifth Amendment to preclude use for impeachment of the accused's voluntary statements to competency examiners. As noted above, time and again the United States Supreme Court has indicated that this most stringent use restriction is limited, for federal constitutional purposes, to statements that were *truly involuntary when made*. In all other situations, the high court has counseled, even if self-incrimination considerations prohibit the *substantive* criminal use of an accused's statements, the statements are available to impeach the accused's later testimony, because the voluntary decision to take the stand at trial includes the obligation to testify truthfully, and the Fifth Amendment is not a license to commit perjury.[3]

Contrary to the majority's implication, nothing in *Estelle v. Smith* (1981) 451 U.S. 454 [68 L.Ed.2d 359, 101 S.Ct. 1866] (*Estelle*) compels the majority's result. If anything, *Estelle* supports the conclusion that, for purposes of the federal Constitution, an accused's uncompelled statements to competency examiners are available for impeachment. The core holding of *Estelle*—which did not directly involve the impeachment issue—is that "[a] criminal defendant, who neither initiates a psychiatric evaluation nor attempts

---

[2] Although *Macias* took passing note that the minor facing a fitness evaluation has alternative means of presenting mitigating evidence, the fact remains that the use immunity there at issue, like the one here, is heavily premised on encouraging the subject to speak, and to do so candidly and truthfully. In *Ramona R., supra,* 37 Cal.3d 802, which confirmed that the juvenile fitness use immunity survived Proposition 8, this court explained the policy behind that immunity by quoting heavily from *In re Wayne H.* (1979) 24 Cal.3d 595 [156 Cal.Rptr. 344, 596 P.2d 1], which similarly immunized a juvenile's statements to a probation officer for purposes of determining the proper disposition if guilt is established. As was noted, " '[s]uch [dispositional] decisions, courts have uniformly concluded, should be based on the most complete knowledge of the defendant's background that is possible. His description and explanation of the circumstances of the alleged offense, and his acknowledgment of guilt and demonstration of remorse, may significantly affect decisions about punishment or transfer for adult proceedings.' " (*Ramona R., supra,* at p. 806, quoting *Wayne H., supra,* at pp. 599–600.)

[3] I discuss below the Sixth Amendment implications of counsel's exclusion from a competency examination.

to introduce any psychiatric evidence, may not be *compelled to respond* to a psychiatrist if his statements can be used against him" on the issues of guilt or penalty. (*Estelle, supra,* at p. 468, italics added; see also *id.* at pp. 462–463.) Thus "[i]f, upon being adequately warned [that he has the right to remain silent, and that he may incriminate himself by speaking], [the defendant] . . . indicate[s] that he [will] not answer [the examiner's] questions, [a] validly ordered competency examination nevertheless [may] proceed[] upon the condition that the results [will] be applied solely for that purpose." (*Id.* at p. 468.)

Much of *Estelle*'s analysis focused on the need to withhold incriminatory use of statements made by the defendant during a compulsory court-ordered competency examination where the defendant was not fully *advised* of his Fifth Amendment rights and given an opportunity to invoke or waive them. In this regard, *Estelle* drew a direct analogy to *Miranda.*

As *Estelle* indicated, the considerations leading to *Miranda*'s requirement that a suspect undergoing interrogation in the inherently coercive atmosphere of police custody receive such warnings "apply with no less force to the pretrial psychiatric examination at issue here." (*Estelle, supra,* 451 U.S. 454, 467.) The accused in *Estelle* was in custody, the court's opinion explained, and, even though the psychiatrist was court-appointed and ostensibly neutral, when he testified against Estelle at the latter's penalty trial, "his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting. During the psychiatric evaluation, [the defendant] assuredly was 'faced with a phase of the adversary system' and was 'not in the presence of [a] perso[n] acting solely in his interest.' [Citation.] Yet he was given no indication that the compulsory examination would be used to gather evidence necessary to decide whether, if convicted, he should be sentenced to death. He was not informed that, accordingly, he had a constitutional right not to answer the questions put to him." (*Ibid.*)

Though " '[v]olunteered statements . . . are not barred by the Fifth Amendment,' " the court concluded, "under *Miranda* . . . we must conclude that, when faced while in custody with a court-ordered psychiatric inquiry, [the defendant's] statements to [the examiner] were not 'given freely and voluntarily without any compelling influences' and, as such, could be used as the State did at the penalty phase only if [the defendant] had been apprised of his rights and had knowingly decided to waive them. [Citation.]" (*Estelle, supra,* 451 U.S. 454, 469.)

Thus, *Estelle* likened a custodial accused's court-ordered competency examination to a custodial police interrogation, in which, even if strict coercion is not present, the situation has an inherently coercive atmosphere which must be ameliorated by advisements of Fifth Amendment rights and an opportunity to invoke them. Of course, statements obtained, without proper advisements, in the coercive environment of custody may not be used as substantive proof of the accused's guilt, *but they may be used for impeachment* unless they were *truly involuntary.*[4]

I realize that under California's judicially declared use immunity, the defendant need not be warned he has a Fifth Amendment right not to speak to competency examiners. Indeed, California decisions have suggested that the accused cannot invoke his Fifth Amendment privilege as a means of avoiding compelled *submission* to a court-ordered competency examination, because the use immunity itself affords all protection the Constitution would provide against the criminal use of his statements to the examiners. (See *People v. Weaver* (2001) 26 Cal.4th 876, 959, 961 [111 Cal.Rptr.2d 2, 29 P.3d 103]; *Arcega, supra,* 32 Cal.3d 504, 523, fn. 6; *Tarantino, supra,* 48 Cal.App.3d 465, 470.)

But a use immunity arising under state law, even if adopted to protect the right against self-incrimination, cannot expand the scope of the federal Constitution—the basis on which the majority purports to decide this case. As the majority itself makes clear, even if a defendant must *face* court-appointed competency examiners, nothing in California law compels him to *speak* to them, though, in consequence of the use immunity, he cannot invoke federal or state constitutional privileges against self-incrimination as a basis for declining to do so. If he chooses to speak under such circumstances, it appears the self-incrimination provisions of the federal Constitution do not preclude impeachment use of his voluntary statements.

---

[4] *Estelle* involved a competency examination conducted under Texas law. In federal criminal trials, use of an accused's statements in a court-ordered competency examination is presently governed by rule 12.2(c)(4) of the Federal Rules of Criminal Procedure (18 U.S.C.). This rule provides that "[a] statement made by a defendant in the course of any [such] examination . . . may be [introduced] against the defendant in any criminal proceeding" only as it bears on a mental condition the defendant himself has placed in issue. My research discloses only one case interpreting this language (formerly contained in 18 U.S.C. § 4244) on the narrow issue whether such statements may be used to impeach the defendant's inconsistent trial testimony. That decision, one which predated *Estelle,* upheld such use, though noting that the psychiatrist's challenged testimony had merely rebutted the defendant's testimonial claim that he did not recall the circumstances of the offense. (*United States v. Castenada* (7th Cir. 1977) 555 F.2d 605, 609–610.)

The majority worries that if a defendant's statements during a court-ordered competency examination can be used to impeach his later, inconsistent trial testimony, his counsel will warn him not to cooperate, and the purpose of the examination will be thwarted. Of course, to the extent a similar consideration was present in *Macias*, it did not dissuade us from concluding that the statements at issue there could be used for impeachment.

In any event, as competent counsel should understand, it remains in the defendant's interest to cooperate fully in a court-ordered competency examination, in order to minimize the chance of an erroneous determination on the issue of competence to stand trial. In return for this cooperation, counsel may advise, the defendant receives full *substantive* immunity from criminal use of his statements—the prosecution cannot obtain an unfair advantage by employing the statements as affirmative proof of his guilt.

If the defendant's statements may be used for impeachment, he suffers that consequence *only* if he *voluntarily* testifies in his own behalf at trial, and, in doing so, makes statements *at odds* with what he told the competency examiners—*an indication that he has lied in one instance or the other*. A rule forbidding impeachment, on the other hand, gives the *defendant* an unfair advantage—he may testify falsely, secure in the knowledge that the fact finder will not learn of contrary statements he has made in the past. In my view, it does not thwart the *legitimate* purposes of a competency examination for counsel to advise his client that, while his statements cannot be used to prove his guilt, they may come back to haunt him if he testifies at trial and changes his story. In effect, such advice promotes the proper purposes of *both* the competency examination *and* the trial—to discover the truth.

Finally, the majority suggests that, under the Sixth Amendment, allowing use of a competency examinee's statements for impeachment might compromise the current California practice which allows the defendant's counsel to be excluded from the examination itself. I am not persuaded. In the first place, as the majority acknowledges, federal decisions are split about whether voluntary statements obtained in direct violation of the Sixth Amendment may be used for impeachment. More fundamentally, I seriously question whether the Sixth Amendment right to counsel includes the unqualified right to the *personal presence* of counsel at a proceeding, such as a competency examination, that is not concerned with obtaining evidence of the defendant's guilt.

Decades ago this court held that, where the defendant's Sixth Amendment right to counsel had attached, and the defendant was represented by counsel, statements obtained at a psychiatric examination in counsel's unwaived absence could be admitted at the guilt trial only if counsel was notified of the

examination in advance, the defendant placed his mental condition in issue at trial, and the statements were used solely to support the psychiatrist's expert opinion. (*In re Spencer* (1965) 63 Cal.2d 400, 409–412 [46 Cal.Rptr. 753, 406 P.2d 33]; see also *In re Cowans* (1970) 2 Cal.3d 733, 737–738 [87 Cal.Rptr. 499, 470 P.2d 635]; *People v. Morse* (1969) 70 Cal.2d 711, 738 [76 Cal.Rptr. 391, 452 P.2d 607].) But none of our decisions on this subject involved the use of such statements exclusively to impeach the defendant's own trial testimony.

Moreover, the high court's more recent decision in *Estelle* strongly suggested that, while the defendant has a Sixth Amendment right to his counsel's *help and guidance* in connection with a court-ordered psychiatric examination, he is not entitled to counsel's *personal presence* at the examination itself. In *Estelle*, after Benjamin Ernest Smith was indicted for murder, and while he was confined in jail, he was examined for trial competency by a court-appointed psychiatrist. Smith's appointed counsel were not present at the examination; indeed, it was not clear counsel had received notice of the psychiatrist's appointment, and counsel were not advised until afterward that the examination had occurred. (*Estelle, supra*, 451 U.S. 454, 457–459 & fn. 5, 471, fn. 15.) Later, at Smith's sentencing trial, the psychiatrist testified that Smith would commit violent criminal acts in the future if given the opportunity to do so.

In its Sixth Amendment discussion, *Estelle* held that Smith's right to counsel had been violated insofar as "[d]efense counsel . . . were not notified in advance that the psychiatric examination would encompass the issue of their client's future dangerousness, and [Smith] was denied the *assistance* of his attorneys in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed." (*Estelle, supra*, 451 U.S. 454, 470–471, fn. omitted, italics added.)

The court pointed out that "[b]ecause '[a] layman may not be aware of the precise scope, the nuances, and the boundaries of his Fifth Amendment privilege,' the assertion of that right 'often depends upon legal advice from someone who is trained and skilled in the subject matter.' [Citation.]" Given the difficult choices to be made in deciding whether to undergo an examination, and how to approach it, said the court, "[i]t follows logically . . . that a defendant should not be forced to resolve such an important issue without 'the guiding hand of counsel.' [Citation.]" (*Estelle, supra*, 451 U.S. 454, 471.)

Though counsel were given no opportunity to attend the examination in *Estelle*, the high court expressly declined to identify counsel's absence as a violation of Smith's Sixth Amendment rights. *Estelle* merely indicated that

Smith's right to the "assistance" of counsel (*Estelle, supra,* 451 U.S. 454, 471) was infringed when he was denied an advance opportunity to *consult* with his attorneys.

Indeed, in a telling footnote, the *Estelle* court remarked: "[Smith] does not assert, and the Court of Appeals did not find, any constitutional right to have counsel actually present during the examination. In fact, the Court of Appeals recognized that 'an attorney present during the psychiatric interview could contribute little and might seriously disrupt the examination.' [Citations.]" (*Estelle, supra,* 451 U.S. 454, 470, fn. 14.)

Given this strong signal from the high court, and notwithstanding our older precedents, I am not willing to assume that the Sixth Amendment requires counsel's presence at a California competency examination before the examinee's statements may be used to impeach him when, after consulting with counsel, he later voluntarily takes the stand and testifies in a manner inconsistent with his statements to the examiners.

For all these reasons, I respectfully dissent from the majority's conclusions that the federal Constitution, or any other principle of law, barred impeachment use of defendant's voluntary statements to his court-appointed competency examiners.

Corrigan, J., concurred.

**WERDEGAR, J.,** Concurring and Dissenting.—I concur in the judgment of affirmance. Like the majority and Justices Baxter and Corrigan, I agree that any error here was harmless. In determining whether there was error, both the majority and Justice Baxter's concurrence and dissent wrestle with a difficult constitutional problem: whether the Fifth Amendment to the federal Constitution prohibits impeaching a defendant with statements made, in the absence of counsel and without *Miranda* warnings (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]), during a competency examination. Because this case can be resolved without squarely confronting that issue, I would do so. (See *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 ·Cal.4th 220, 230 [45 Cal.Rptr.2d 207, 902 P.2d 225]; *People v. McKay* (2002) 27 Cal.4th 601, 626–627 [117 Cal.Rptr.2d 236, 41 P.3d 59] (conc. opn. of Werdegar, J.).) As will appear, the state immunity we have previously recognized for statements made during competency examinations, properly understood, applies to bar their use for impeachment.

# I

The Court of Appeal first recognized a state use immunity applicable to competency hearings in *Tarantino v. Superior Court* (1975) 48 Cal.App.3d 465 [122 Cal.Rptr. 61] (*Tarantino*). There, the trial court expressed a doubt as to the defendant's mental competence and appointed two psychiatrists to examine him. (See Pen. Code, § 1368, subd. (a).)[1] The defendant refused to proceed without counsel, the psychiatrists refused to proceed in the presence of counsel, and the trial court attempted to resolve the standoff by holding the defendant in contempt.

In reversing the contempt order, the Court of Appeal concluded any statements made at a competency examination should receive use immunity: "[W]e have no hesitancy in declaring that neither the statements of petitioner to the psychiatrists appointed under section 1369 nor the fruits of such statements may be used in trial of the issue of petitioner's guilt, under either the plea of not guilty or that of not guilty by reason of insanity." (*Tarantino, supra,* 48 Cal.App.3d at p. 470.) The court found this immunity implicit in the code provisions compelling defendants to submit to competency examinations: "The purpose of such inquiry [into competency] is not to determine guilt or innocence. It has no relation to the plea of not guilty by reason of insanity. Rather, the sole purpose of these statutes is the humanitarian desire to assure that one who is mentally unable to defend himself not be tried upon a criminal charge.[2] This purpose is entirely unrelated to any element of guilt, and there is no indication of any legislative intent that any result of this inquiry into a wholly collateral matter be used in determining the issue of guilt. Moreover, the issue of present competency, once the trial court's doubt has been expressed, must be decided before any trial of the charged offense. Both humanitarian and practical considerations call for a judicially declared immunity." (*Tarantino,* at p. 469.) Thus, the court interpreted section 1367 et seq. as reflecting an intent to compel a defendant to submit to a competency examination, but only on the implicit understanding that any statements he or she made would not be used for any purpose at the subsequent guilt phase of trial.

We approved this state immunity in *People v. Arcega* (1982) 32 Cal.3d 504 [186 Cal.Rptr. 94, 651 P.2d 338] (*Arcega*), there explaining that the immunity

---

[1] All further unlabeled statutory references are to the Penal Code.

[2] As the majority correctly notes, the humanitarian impulse reflected in competency hearings is of constitutional dimension. (Maj. opn., *ante,* at p. 1250; see also *Pate v. Robinson* (1966) 383 U.S. 375, 378 [15 L.Ed.2d 815, 86 S.Ct. 836] ["[T]he conviction of an accused person while he is legally incompetent violates due process"]; *People v. Lawley* (2002) 27 Cal.4th 102, 131 [115 Cal.Rptr.2d 614, 38 P.3d 461]; *People v. Castro* (2000) 78 Cal.App.4th 1402, 1419 [93 Cal.Rptr.2d 770] ["Due process requires that any doubt regarding the defendant's competency be properly evaluated by experts prior to proceeding with trial"].)

"protects both an accused's privilege against self-incrimination and the public policy of not trying persons who are mentally incompetent." (*Id.* at p. 522.) We described *Tarantino* as recognizing a "blanket immunity" against use of competency examination statements, and recognized that this immunity was broader than that yet recognized by the United States Supreme Court under the federal Constitution. (*Arcega*, at p. 523, fn. 6; see *Centeno v. Superior Court* (2004) 117 Cal.App.4th 30, 42 [11 Cal.Rptr.3d 533] ["The California rule of judicial immunity is broader than the federal rule for compliance with the Fifth and Sixth Amendments"].) While under United States Supreme Court precedent the voluntary statements of an adequately warned defendant could be used, we held *Tarantino* dispensed with the need for warnings by reading the underlying statutes as confining use to the question of competence. (*Arcega*, at p. 523, fn. 6; see *Estelle v. Smith* (1981) 451 U.S. 454, 468–469 [68 L.Ed.2d 359, 101 S.Ct. 1866]; *Tarantino*, *supra*, 48 Cal.App.3d at p. 469.)

Subsequently, we have unanimously reaffirmed the existence of this state immunity (*People v. Jablonski* (2006) 37 Cal.4th 774, 802–803 [38 Cal.Rptr.3d 98, 126 P.3d 938]; *People v. Weaver* (2001) 26 Cal.4th 876, 959–963 [111 Cal.Rptr.2d 2, 29 P.3d 103]), and neither the majority nor Justice Baxter's concurrence and dissent questions its ongoing validity. (See maj. opn., *ante*, at pp. 1245–1246; conc. & dis. opn. of Baxter, J., *ante*, at pp. 1256–1257.) As Justice Baxter correctly notes (conc. & dis. opn. of Baxter, J., *ante*, at pp. 1256–1257), *Arcega*'s approval of this immunity in the months following passage of Proposition 8 (as well as our subsequent reaffirmance of the rule in *Weaver*, at p. 960, and *Jablonski*, at p. 802) indicates the immunity was not invalidated by Proposition 8's "Truth-in-Evidence" provisions, which left unaffected "existing statutory rule[s] of evidence relating to privilege." (Cal. Const., art. I, § 28, subd. (d).)[3]

While acknowledging the state immunity's validity, the majority treats it as little more than an echo of the Fifth Amendment to the federal Constitution. It is not. The state immunity predates the United States Supreme Court's recognition of Fifth Amendment limits on the use of competency examination statements. (See *Estelle v. Smith*, *supra*, 451 U.S. at pp. 468–469; *Tarantino*, *supra*, 48 Cal.App.3d at pp. 469–470.) Moreover, while the interpretation of

---

[3] Contrary to the majority's suggestion that the immunity lacks any such statutory foundation (maj. opn., *ante*, at p. 1253, fn. 5), it has its roots in the Penal Code's statutory description of the scope and purpose of competency examinations (see §§ 1367–1370), as well as the statutory privilege against self-incrimination (Evid. Code, § 940). The immunity arises from *Tarantino*'s interpretation of these statutes in a manner that *avoids* constitutional problems. (See *Tarantino*, *supra*, 48 Cal.App.3d at p. 469 ["As to the right against self-incrimination, we find no violation in compelling a defendant to submit to examination by court-appointed psychiatrists under section 1367 et seq., at least under a judicially declared immunity *reasonably to be implied from the code provisions*" (italics added)].)

our state statutes as giving rise to immunity certainly was motivated in part by self-incrimination considerations, it was equally motivated by an understanding of the legislative policy considerations underlying the specific Penal Code provisions themselves. (See *People v. Weaver, supra,* 26 Cal.4th at p. 960, quoting *Arcega, supra,* 32 Cal.3d at p. 522 [" '[T]he rule protects *both* an accused's privilege against self-incrimination *and* the public policy of not trying persons who are mentally incompetent' " (italics added)].) We have never before treated the state immunity as limited by the Fifth Amendment. We have rejected the assertion that it is less protective than the Fifth Amendment (see *People v. Jablonski, supra,* 37 Cal.4th at p. 802 [rejecting claim that the state immunity "inadequately protect[ed] a defendant's Fifth Amendment interest against self-incrimination" and allowed use of statements prohibited by the Fifth Amendment]) and have acknowledged that it may in some respects operate differently or more broadly (see *Arcega,* at p. 523, fn. 6).[4] We thus can decide this case without reaching difficult and uncertain federal constitutional questions. We should do so.

## II

The question remains whether the state immunity applies to use of Pokovich's statements to impeach him during guilt proceedings. I conclude that it does.

State law expressly forbids trial of one who is mentally incompetent (§ 1367, subd. (a)) and in specified circumstances mandates that the defendant undergo a mental competency examination (§§ 1368, 1369). As the Court of Appeal observed in *Tarantino, supra,* 48 Cal.App.3d at pages 469–470, the statutes requiring a competency examination implicitly contemplate use of the defendant's statements obtained during the examination *only* in the competency proceeding itself, not in the separate, subsequent guilt proceeding. The competency proceeding is wholly distinct from the criminal trial. The initiation of a competency proceeding requires suspension of criminal proceedings (§§ 1368, subd. (c), 1370, subd. (a)(1)(B)), and the competency proceeding is subject to its own special rules and procedures (§ 1369, subds. (b)–(f); *People v. Lawley, supra,* 27 Cal.4th at p. 131 ["Although it arises in the context of a criminal trial, a competency hearing is a special proceeding, governed generally by the rules applicable to civil proceedings"]). The psychiatrists and psychologists appointed by the court to examine a defendant are tasked with making a series of determinations wholly unrelated to guilt or

---

[4] To the extent the immunity rests on a broader state conception of the privilege against self-incrimination (see Cal. Const., art. I, § 15; Evid. Code, § 940) than would be strictly compelled by the Fifth Amendment to the federal Constitution, a point on which I express no view, such a broader interpretation is permissible. (See *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 353–355 [276 Cal.Rptr. 326, 801 P.2d 1077].)

innocence: (1) whether the defendant has a mental disorder, (2) whether the defendant is able to understand proceedings and assist counsel in presentation of a defense, and (3) whether the defendant is susceptible to treatment with antipsychotic medication and able to make decisions about consenting to medication. (§ 1369, subd. (a).) As *Tarantino* originally recognized, "there is no indication of any legislative intent that *any* result of this inquiry into a wholly collateral matter be used in determining the issue of guilt." (*Tarantino*, at p. 469, italics added.)

These statutory provisions are intended to vindicate the Legislature's compelling interest in avoiding trial of those who, due to mental illness or developmental disability, cannot defend themselves. Vindication of that interest through accurate psychiatric evaluations requires full cooperation on the part of defendants compelled to submit to competency examinations, as the facts of *Tarantino* amply demonstrate. Clearly, however, full cooperation, although essential, cannot be anticipated from defendants counseled not to speak for fear statements made while in a questionable mental state will subsequently be used to impeach their later testimony should they exercise their right to testify at trial.

We have approved *Tarantino*'s recognition of "blanket immunity" (*Arcega, supra*, 32 Cal.3d at p. 523, fn. 6); a *blanket* immunity connotes an absolute bar on any use of statements from the competency examination in the separate guilt proceeding. Using such statements, even in rebuttal, to prove a defendant's guilt would contravene the Legislature's intent that a mentally incompetent defendant not be tried and that information about the accused's mental state be gathered solely to determine whether he is able to defend himself. Because satisfaction of the Legislature's compelling interest in trying only the competent depends on the defendant's cooperation, it follows that vindication of that interest requires the defendant be granted full immunity. (Accord, *People v. Harris* (1987) 192 Cal.App.3d 943, 950 [237 Cal.Rptr. 747] [competency examination statements may not be used for impeachment during guilt proceedings].)

I note as well that, to the extent the statutory structure might be read to permit compelled competency examinations, followed by use of any statements obtained therein in guilt proceedings, such an interpretation would raise serious constitutional questions. Whether one concludes such an interpretation would countenance a Fifth Amendment violation (as does the majority) or not (as does Justice Baxter's concurrence and dissent), we generally will prefer interpretations that avoid grave constitutional doubts. (*People v. Brown* (1993) 6 Cal.4th 322, 335 [24 Cal.Rptr.2d 710, 862 P.2d 710].)

Thus, consistent with *Tarantino* and *Arcega*, I conclude the statutes authorizing competency examinations and proceedings preclude any use of statements obtained therein in guilt phase proceedings, and the impeachment use of Pokovich's competency examination statements in his subsequent guilt trial violated this state immunity. Accordingly, I express no opinion as to whether the Fifth Amendment to the federal Constitution also precludes the use of such statements in this case.

Because on this record any error nevertheless was harmless, I concur in the judgment.