Filed 12/9/20  P. v. Clark CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C080295 |
| Plaintiff and Respondent, | (Super. Ct. No. 14F06759) |
| v. | |
| JAIME L. CLARK, | |
| Defendant and Appellant. | |

SUMMARY OF THE APPEAL

A jury convicted defendant, Jaime L. Clark, of one count of robbery (Pen. Code, § 211; statutory section references that follow are to the Penal Code unless otherwise stated), three counts of burglary (§ 459), and one count of resisting arrest (§ 148, subd. (a)).  At the sentencing hearing, the trial court found defendant's record included a prison prior within the meaning of section 667.5, subdivision (b).  The trial court sentenced defendant to an aggregate term of six years in prison, one year of which the

1

trial court imposed due to the section 667.5, subdivision (b) finding, and to one year in jail on the resisting arrest conviction to run consecutive to the prison sentence.

On appeal, defendant argues (1) his trial counsel provided ineffective assistance of counsel for a number of reasons; (2) the trial court erred by failing to instruct the jury sua sponte with a claim of right defense; (3) the prosecution violated his Fifth Amendment right against self-incrimination by impeaching him with statements made in a court-ordered competency evaluation; (4) the trial court denied him a complete defense by preventing redirect examination regarding his competency evaluation thus violating his right to due process and fair trial; (5) the trial court erroneously instructed the jury that robbery and burglary required mere wrongful intent, allowing the jury to convict defendant without finding he had a specific intent to steal; and (6) the cumulative effect of the errors alleged in items (1)-(5) deprived him of due process and a fair trial in violation of his constitutional rights. In supplemental briefing, defendant asserts (7) he is entitled to a remand to allow the trial court to determine whether to grant him a mental health diversion pursuant to section 1001.36; and (8) due to an amendment to sentencing laws made after he was sentenced in the trial court, but before we have made our decision on appeal, the section 667.5, subdivision (b) prior prison term must be stricken. We affirm the jury's findings, but remand with instructions to strike the one-year sentence enhancement imposed for defendant's prison prior and to consider whether defendant is eligible for pretrial diversion under section 1001.36.

FACTS AND PROCEDURAL HISTORY

*The Robbery and Burglaries*

On September 24, 2014, over the course of the morning and early afternoon, defendant smoked methamphetamine twice. At around 3 p.m., he entered a CVS store located at 17th and K Street in Sacramento, California. According to Catherine Love, who worked as a floor manager at the CVS at that time, defendant first went to the

2

cosmetics aisle and began grabbing items, and then he made his way to the liquor aisle where he also pulled multiple items off the shelves. Love said defendant entered the store repeatedly that afternoon.

When Love approached defendant to see if she could take items to the front of the store where he could pay for them, he threatened to kill her, spoke irrationally, and said things she could not understand. During one of his early trips into the store, Hannah Jackson, a CVS employee, spoke to defendant and tried to get him to leave the store. He ignored her until she tried to take a liquor bottle from him, at which point he said to her, "I have ways" and told her not to mess with him. Jackson called the police. As defendant left the store, Love followed him, and she and another employee, Christina Whiteside, pulled some of the bottles away from defendant, but he got away with one. Love testified that as he left, defendant almost hit an employee in the face with a bottle. Defendant ran away. The police arrived and spoke with the employees, and they told the employees to call again if defendant returned.

After the police left, defendant came back and grabbed two 30-packs of beer off a shelf at the front of the store. Jackson tried to stop defendant from taking the beer, but he made a motion as if he was swinging at her, so she got out of the way and let him leave. Jackson called the police again.

Defendant again came back and grabbed handfuls of candy and ran out. When defendant came back another time, the employees tried to shut the doors to the store before he could get in, but he got inside. They decided to try to lock the doors and keep defendant inside until the police arrived. Love tried to hold the door closed from the outside and Whiteside and Jackson tried to convince defendant to stay inside the store. Defendant got increasingly loud and aggressive, yelled at the employees to open the door, and tried to forcefully open the door. A customer who had observed defendant entering and exiting the store gave a can of mace or pepper spray to Jackson. Jackson then gave the pepper spray to Whiteside. Defendant ran towards the door, but Whiteside feared he

3

was going towards her and sprayed him with the pepper spray. Love was concerned about leaving customers in the store with pepper spray in the air and opened the door. Defendant left and rested on the ground near the store.

When Officer Helen Mortlock arrived at the store after defendant last entered it, he was sitting in the bushes with items he had taken from the store. As Officer Mortlock approached defendant, he opened a beer and started chugging it. Defendant did not stop drinking when Officer Mortlock told him to put the beer down. Another police officer showed up to assist, and defendant did not respond to either officer's commands. When the officers tried to put handcuffs on defendant, he resisted, tensing up and pulling his arms in-front when they tried to move his arms behind his back, and kicking when he got to the ground. Eventually, a team of five officers got defendant's hands behind his back and placed him in handcuffs.

*Examination for Competency to Stand Trial*

Michael Kelly, M.D., a member of the Department of Psychiatry and Behavior Science and the University of California, Davis Medical Center performed a section 1369 evaluation to determine defendant's fitness to stand trial. Dr. Kelly concluded defendant was competent to stand trial.

Dr. Kelly diagnosed defendant with (1) "Schizophrenia, multiple episodes, currently in acute episode"; (2) methamphetamine use disorder; (3) antisocial personality disorder; and (4) an unspecified cocaine-related disorder. The methamphetamine use disorder and schizophrenia diagnoses, the basis for them, and Dr. Kelley's assessment of their impact are of particular importance here.

With respect to the methamphetamine use disorder, Dr. Kelly considered defendant's representation that he has a history of using methamphetamine. Dr. Kelly concluded that defendant minimized the extent of his methamphetamine use and that it

4

has impacted defendant's ability to fulfill adult obligations such as maintaining steady employment.

To support the schizophrenia diagnosis, Dr. Kelly observed defendant, "reported that he began experiencing auditory hallucinations and developed a belief that a 'microchip' had been implanted in his brain around 2008. [Defendant]'s medical records from the Sacramento County Jail indicate that he experienced hallucinations and paranoia dating back to 2004. In addition, [defendant] has consistently reported that he experiences intermittent auditory hallucinations and expressed the delusional belief . . . that a microchip has been surreptitiously implanted in his body to Sacramento County Jail staff in recent years. [The doctor] carefully considered the possibility that [defendant]'s symptoms consistent with schizophrenia are substance induced. However, . . . it is unlikely that his current symptoms are due to the ongoing effects of his previous substance use." Dr. Kelly believed defendant was not malingering with respect to his reports of auditory hallucinations.

Despite Dr. Kelly's diagnoses of defendant, he concluded defendant was competent to stand trial. This was, in large part, due to defendant's receipt of relatively high scores on the Montreal Cognitive Assessment (23 out of 25) and the Georgia Court Competency Test (100 out of 100). With respect to the impact of defendant's schizophrenia diagnosis, Dr. Kelly, carefully considered the possibility that defendant was not able to understand the nature of criminal proceedings because he reported that he had a microchip in his brain, he believes that his thoughts are being "catalogued by an unknown outside entity," and because he experiences intermittent auditory hallucinations, but concluded "with reasonable medical certainty" that defendant "is able to understand the nature of the criminal proceedings." In reaching this conclusion, Dr. Kelly identified a variety of factors which indicate that defendant has a clear understanding of the nature of criminal proceedings, including having an understanding of important legal strategies, the nature of the charges against him, the adversarial nature of courtroom proceedings,

5

the role of various courtroom personnel, and the role of evidence at trial. Additionally, Dr. Kelly wrote:

> "Mr. Clark told me that the 'microchip' that he believes was implanted in his brain to monitor his thoughts is a matter that is distinct from his arrest and pending court case. For example, Mr. Clark told me that he does not believe that the 'microchip' he asserts is inside his brain has anything to do with his arrest and the potential outcome of his case. Mr. Clark said that his beliefs about having a 'microchip' in his brain 'shouldn't have nothing to do with this.' Mr. Clark added that from his perspective, he did not deserve to be charged with felonies and instead should have been charged with 'petty theft.' In addition, Mr. Clark told me that his auditory hallucinations were not a source of distraction for him and that he did not believe the chip in his brain would compromise his defense. Mr. Clark's statements indicate that his ability to understand the nature of the criminal proceedings is not compromised by his delusional belief that there is a 'microchip' implanted in his brain."

Consistent with Dr. Kelly's explanation of his findings, he reported defendant said he would not consider a plea of not guilty by reason of insanity because, "I'm not insane." Also, when Dr. Kelly asked defendant if his defense attorney might have wanted the competency exam due to defendant's statement about a microchip in his head, defendant stated he felt it should "have nothing to do with this" case. Defendant said that he believed the request for an evaluation was a result of the fact that his counsel was "distracted" when the real issue in the case was whether he should have been charged with a felony when the crime was a "petty theft." Defendant indicated he felt his counsel was, "[t]rying to make me look as if I'm something that I'm not. . . . I'm not incompetent."

6

*The Trial*

*Presentation of Evidence*

Three CVS employees, a police officer, and a customer testified at trial for the people. The People used footage taken from the store's security cameras to guide and support their witnesses' testimony.

Defendant testified in his own defense at trial. He testified that sometime in the afternoon, after smoking methamphetamine and before he went to the CVS, he got a strange feeling "from the spy chip [in his head] and the high." He claimed he felt as if "the universe had granted [him] some . . . rights." Initially, he testified that it was not his "intention" to steal, but he "kind of felt like [he] was a part of the sweepstakes and [he] had so much time to . . . grab some stuff." His testimony continued:

> "Q Okay. Now, in your mind were you stealing those items?
>
> "A Huh, no, but I am aware that it was petty theft, shoplifting.
>
> "Q You say you are aware of that. Is that something that you are aware of now?
>
> "A Uhm, yeah, I'm aware of it now, but I was also aware that the crime that was being committed was petty theft, shoplifting.
>
> "Q And so at the time that you took the items, you are saying you were aware you were committing a petty theft at that time?
>
> "A Yes, I'm aware I was committing misdemeanor offenses.
>
> "Q Let me ask you this question: You said earlier you thought you were in some type of sweepstakes?
>
> "A Yes.
>
> "Q Now, did you think you were in some type of sweepstakes or did you think you were committing a petty theft?
>
> "A Like I said, I thought that the universe had granted me the rights to get these items, and I had so much time to get them, and if I would have got them within that certain amount of time, I could have the items."

Defendant testified that after he left the store a final time, when he saw a police officer, he became "resigned to the fact that [he] was going to jail for committing misdemeanor offenses." Later in his testimony, he indicated he began guzzling a beer he had opened because he was "going to go to jail for these petty thefts."

During cross-examination, the People tried to get defendant to confirm he has been smoking methamphetamine since 2010, and at the time of the offense had been smoking it about twice a week. As part of their efforts, the People engaged in the following questioning:

> "Q You use methamphetamine approximately two times a week, though, right?
>
> "A Approximately two times a week? Possibly.
>
> "Q Well, do you remember being interviewed by Dr. Kelly in jail?
>
> "A Yes, I do.
>
> "Q Do you remember telling him you smoked methamphetamine two times a week?
>
> "A I believe I did say that.
>
> "Q Was that the truth?
>
> "A Well I never recorded how many times I have actually smoked methamphetamine, so I gave an estimation of how many times I probably do it a week."

On cross-examination, defendant again said that he felt the "spy chip" in his head combined with the methamphetamine made him believe he had a right to take the items. When he claimed to have "never done anything like this before," the People questioned him about a 2010 conviction for felony grand theft. Defendant maintained he had not actually committed the 2010 crime, but accepted an offer to plea because it got him out on time served.

8

During cross-examination, defendant admitted he was "aware it is wrong" to walk into a store and take items, but he argued that it was his belief the offenses he committed were misdemeanor petty theft and not felonies. In an effort to minimize the impact of the prosecution witnesses' description of events, defendant testified he was kicking the door "simply" because he wanted to get out of the store, that if he was going to commit robbery he would have done so differently, and that if the employees thought he had a weapon they would not have tried to stop him and no one would assume a robber does not have a weapon. Defendant suggested that videotapes shown during the direct examination of store employees to corroborate their version of events had been doctored. Defendant indicated, "I do remember committing petty theft on three occasions and those three occasions are consistent with the three second degree misdemeanor burglaries." Additionally, with respect to the felony charge, he indicates he did not swing any items at anyone.

Defense counsel's redirect examination of defendant was as follows:

"Q On cross-examination you were asked about an interview you gave Dr. Kelly. What was that all about?

"A Uhm, the first trial attorney that I had, uh, which I believe her name [was] Ms. Wong.

"MR. WASLEY: Objection, your Honor.

"THE COURT: Sustained. Wait for the next question, sir.

"MR. CALVILLO: Nothing further."

*Closing Arguments*

During closing arguments, the People focused on the role of force and fear in defining a robbery, stressing to the jury that they need not find that force or fear was used to acquire property. Rather the jury could find an act of force and fear was used in the robbery if they concluded force or fear was used to retain property once defendant had it

9

in his possession. The defense also focused on whether the People had proven force or fear was used during the robbery, arguing that the videos did not really back up the People's witnesses' testimony regarding force used by the defendant, and that common sense dictated the CVS employees would not have tried to keep defendant in the store if they were afraid of him. Additionally, the defense spent some time arguing that, given the evidence of defendant's behavior and his testimony, there was enough evidence to put into question that defendant had the specific intent required to find him guilty of robbery and burglary. More specifically, defense counsel argued that defendant's behavior was bizarre, and highlighted defendant's belief that he had won some sort of sweepstakes that allowed him to take what he wanted from the CVS. On rebuttal, the People countered defense's argument regarding defendant's mental state by arguing, "[y]ou haven't heard any evidence of that. You heard a passing comment from an officer who said he looked high on meth. ¶ He didn't say he didn't know what he was doing. He knew exactly what he was doing. He went there to shoplift. He told us that he remembered that date clearly. He remembered indulging in methamphetamine. You have received no evidence that he didn't know what he was doing."

## DISCUSSION

### I

### *The Role of Intent in Robbery and Burglary*

Many of defendant's arguments relate to whether the People proved he had the specific intent to be guilty of robbery or burglary. We begin our discussion of the merits of defendant's claims with an overview of the specific intent required for robbery and burglary.

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Our Supreme Court has clarified that robbery "is larceny with the

10

aggravating circumstances that 'the property is taken from the person or presence of another . . .' and 'is accomplished by the use of force or by putting the victim in fear of injury.' (*People v. Gomez* (2008) 43 Cal.4th 249, 254, fn. 2 [74 Cal. Rptr. 3d 123, 179 P.3d 917].)" (*People v. Anderson* (2011) 51 Cal.4th 989, 994 (*Anderson*).) As to burglary, according to section 459, "[e]very person who enters any . . . store . . . with intent to commit . . . petit[ theft] . . . is guilty of burglary." (See also, § 490a ["Wherever any law or statute of this state refers to or mentions larceny . . . said law or statute shall hereafter be read and interpreted as if the word 'theft' were substituted therefor"].)

Generally, courts will not find a defendant guilty of committing a crime " 'unless there is a union of act and either wrongful intent or criminal negligence.' " (*Anderson*, *supra*, 51 Cal.4th at p. 994.) As to the act a defendant must specifically intend to accomplish in order to be found guilty of robbery, our Supreme Court has held "the intent element of robbery does not include an intent to apply force against the victim or to cause the victim to feel fear. It is robbery if the defendant committed a forcible act against the victim motivated by the intent to steal, even if the defendant did not also intend for the victim to experience force or fear." (*Id.* at p. 992.) Put differently, to be found guilty of robbery, a jury must find a defendant intended to steal, and though the use of force or fear is also an element of the crime of robbery, it is not essential that the court find the defendant also intended to use force or fear. The intent requirement for burglary is more plainly stated in statute: a person is guilty of burglary when he or she enters one of a list of specified structures--in this case, a store--"with intent" to steal or commit a felony. (See § 459.)

II

*Ineffective Assistance of Counsel*

Defendant makes a host of arguments in an effort to convince us that his trial counsel rendered prejudicially ineffective assistance of counsel. These arguments all

11

suggest that defendant's trial counsel ought to have done more to advance a case that defendant lacked the specific intent required to commit robbery or burglary. They include (1) an argument that defense counsel ought to have called an expert witness to demonstrate that due to his mental illness defendant actually lacked the specific intent required to commit the crimes; (2) an argument that defense counsel ought to have requested a jury instruction that voluntary intoxication can negate specific intent; and (3) an argument that defense counsel ought to have requested a jury instruction that indicated the jury could find defendant lacked the requisite intent because he honestly believed he had a right to the property he took from the CVS drugstore. We are not persuaded by defendant's arguments.

"To show ineffective assistance of counsel, defendant has the burden of proving that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different." (*People v. Kelly* (1992) 1 Cal.4th 495, 519–520.) " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Bolin* (1998) 18 Cal.4th 297, 333.)

We presume counsel's conduct fell within the "wide range of reasonable professional assistance." (*People v. Maury* (2003) 30 Cal.4th 342, 389.) Our review is limited to the record on appeal and we must reject a claim of ineffective assistance "if the record sheds no light on why counsel acted or failed to act in the manner challenged unless (1) counsel was asked for and failed to provide a satisfactory explanation or (2) there simply could be no satisfactory explanation." (*People v. Burgener* (2003) 29 Cal.4th 833, 880.) If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 697 [80 L.Ed.2d 674].) " 'In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be

no conceivable reason for counsel's acts or omissions.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1051.)

If we consider the question of whether counsel's actions caused prejudice to the defendant, that "prejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' (*Strickland v. Washington, supra,* 466 U.S. at p. 694.)" (*People v. Maury, supra,* 30 Cal.4th at p. 389.)

Defendant argues trial defense counsel provided prejudicially ineffective assistance by failing to introduce expert testimony regarding defendant's mental illness for the sake of negating specific intent. More specifically, defendant argues that the record "discloses no rational tactical purpose for failing to raise a diminished actuality defense and there could be no satisfactory explanation for failing to do so." Defendant's theory is that, while California law might not allow defendants to defend their cases by arguing they have a "diminished capacity" to form the requisite mental state to be found guilty of committing a crime, a jury may still consider a defendant's mental condition to determine whether he actually formed the requisite criminal intent, and expert testimony is the "typical[]" form of evidence used to demonstrate a "diminished actuality" defense. (See § 28, subd. (a) ["Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state . . . with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged"].)

We disagree with defendant's argument that the record discloses no tactical purpose or satisfactory explanation for failing to call an expert witness to provide evidence regarding defendant's mental state. The record shows at least two explanations

13

for defendant's attorney's decision not to call an expert witness to discuss the impact of defendant's schizophrenia on whether he actually formed the requisite intent.

First, it is possible expert testimony would have run counter to defense counsel's efforts to convince the jury that defendant's condition caused him to have a legitimate belief that he could take the property. Second, the record shows defendant wanted to, and did, pursue an argument that he did not use force or fear in taking the property. To make this argument, the defense relied almost entirely on defendant's own recollection of the events at the CVS drugstore. If defense counsel had made too much of the impact of defendant's illness, it could have run counter to any efforts to convince the jury that defendant was a reliable narrator with an accurate recollection.

In his competency interview with Dr. Kelly, defendant insisted the microchip he believed he had in his head had nothing to do with this case, that he would not consider an insanity plea because he was not insane, and that the real issue in the case was not his competency but whether the crime he allegedly committed ought to have been treated as a felony or petty theft. Additionally, in finding defendant competent to stand trial, Dr. Kelly observed that despite his reports that he had believed he had a microchip in his brain, defendant had the ability to understand important aspects of criminal proceedings including strategies used in legal proceedings and the role of evidence.

While it is true that, at trial, defendant decided to share a theory that a "spy chip" in his head made him feel he had some special rights, and that explanation was seemingly bizarre, the nature of what defendant chose to say in court does not alter the fact that the record indicates that at some point before trial, defendant believed the "spy chip" had nothing to do with his crime. Given this, it is possible that in the lead up to trial defendant and his counsel were more focused on whether the crimes he committed were felonies or petty thefts than on whether he believed he had a right to take the items. Indeed, besides discussing his state of mind when he committed the crimes, during his testimony on direct and cross, defendant repeatedly stressed that what he committed was

14

a "misdemeanor" or "petty theft." In light of this, it is possible that defendant's trial counsel believed (1) that an expert evaluation and testimony about defendant's mental illness might be more likely to strengthen a jury's belief that defendant's schizophrenia did not impact the actual intent he possessed when he committed the subject crimes; or (2) that expert testimony could destroy any possibility that the jury would treat defendant as a credible witness.

The record does not show that defendant's trial counsel provided ineffective assistance because he did not call an expert to testify about the impact of schizophrenia on defendant's mental state.

Appellant also claims trial counsel was ineffective for failing to request a voluntary intoxication instruction, CALCRIM No. 3426, which states, in part:

"You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted . . . with . . . 'the intent to do the act required.'

"A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect."

Defendant suggests that given defendant's statements regarding the impact of the "spy chip" in his head combined with his admitted methamphetamine use negated the specific intent required for him to be found guilty of the robbery and burglary.

As a preliminary matter, on this record, it cannot be said "there simply could be no satisfactory explanation" for defense counsel to avoid requesting this instruction. (*People v. Burgener, supra,* 29 Cal.4th at p. 880.) As the People aptly argue, defense counsel may have believed that adding these instructions on top of a mental impairment instruction would have resulted in "muddying the waters." Defense counsel chose to base his case primarily on the theory that defendant did not use force or fear in committing the alleged crimes. Defense counsel might have felt that drawing too much

15

attention to the fact that defendant was using methamphetamine on top of his possible mental illness would make it harder to accept defendant's testimony that he never threatened anyone. Defendant's primary evidence for convincing the jury he did not use force or fear was his own testimony of his recollection of the incidents that led to his arrest. It is more plausible that defendant accurately remembered the events of the day while still suffering internal delusions if his intoxication levels did not impact his ability to process events actually happening around him. It is a fine point, but in focusing on the nature of defendant's alleged belief that he had some rights, defense counsel was asking the jury to believe that even though something did not happen--the universe did not give defendant some special rights--defendant honestly believed it did. To make its force or fear argument, the defense asked the jury to accept that if defendant said something did not happen--he did not use force or fear--it actually did not. Essentially, defense counsel needed the jury to accept that an illness that caused defendant to suffer a delusion did not cause defendant to be unable to perceive an event that actually did occur. The defense relied on the jury concluding that defendant's condition could add something to defendant's perception of what was happening but not take away from it. If one adds an argument that defendant was too intoxicated to know right from wrong to this mix, it becomes harder to convince a jury that defendant accurately remembered that his behavior was not threatening.

Additionally, any error in not requesting the instruction was not prejudicial. There is not a "reasonable probability that, but for counsel's" decision not to seek a voluntary intoxication instruction, "the result [of the proceeding] would have been different." (See *People v. Kelly, supra,* 1 Cal.4th at pp. 519–520.) Given defendant's own efforts to argue what he actually engaged in was petty theft, his suggestion that the videos from the store were doctored; his efforts to minimize prior convictions; his statement during direct that he was "aware that the crime that was being committed was petty theft"; and that almost immediately after his spree he became "resigned to the fact that [he] was going to

16

jail for committing misdemeanor offenses"; "confidence in the outcome" of the jury's deliberations is not undermined when one considers the voluntary intoxication instruction was not given. (See *People v. Bolin, supra,* 18 Cal.4th at p. 333.) The jury likely found that defendant lacked any sort of credibility, and defendant's efforts to convince the jury he felt he had some rights and was not aware he was committing theft due the "spy chip" in his head and his methamphetamine use fell flat.

Similar to his argument regarding a voluntary intoxication defense, defendant argues trial counsel was ineffective for failing to request the claim of right defense instruction, CALCRIM No. 1863, which states:

"If the defendant obtained property under a claim of right, he did not have the intent required for the crime of (theft/ [or] robbery).

"The defendant obtained property under a claim of right if he believed in good faith that he had a right to the specific property or a specific amount of money, and he openly took it.

"In deciding whether the defendant believed that he had a right to the property and whether he held that belief in good faith, consider all the facts known to him at the time he obtained the property, along with all the other evidence in the case. The defendant may hold a belief in good faith even if the belief is mistaken or unreasonable. But if the defendant was aware of facts that made that belief completely unreasonable, you may conclude that the belief was not held in good faith.

"The claim-of-right defense does not apply if the defendant attempted to conceal the taking at the time it occurred or after the taking was discovered.] [¶] . . . [¶]

"If you have a reasonable doubt about whether the defendant had the intent required for (theft/ [or] robbery), you must find him not guilty[.]"

We reject this claim for reasons similar to our rejection of defendant's claim regarding a voluntary intoxication instruction: defense counsel may have made a tactical

17

decision not to pile on too many theories that would draw attention to defendant's level of intoxication and defendant was not prejudiced by the absence of the instruction.

III

*The Trial Court Was Not Obligated to Give a Sua Sponte Claim of Right Instruction*

In his opening brief, defendant argues that the court ought to have issued, sua sponte, a jury instruction on CALCRIM No. 1863. In advancing this argument, defendant noted that, at the time he filed his opening brief, there was a split of authority "about whether the trial court must instruct sua sponte on the defense of claim of right." In *People v. Hussain* (2014) 231 Cal.App.4th 261, 268-269, this court found the trial court does not have a sua sponte duty to instruct on a claim of right defense. In contrast, the Sixth Appellate District had found in *People v. Russell* (2006) 144 Cal.App.4th 1415, 1429, that "[i]f the defendant relies on a claim-of-right defense or if there is substantial evidence that supports the defense and the defense is not inconsistent with the defendant's theory of the case, the trial court must instruct sua sponte on the defense." Since defendant filed his opening brief, our Supreme Court has resolved the split, indicating that it agrees "with the Court of Appeal in *Hussain* . . . . Accordingly, here, because the asserted claim of right served only to negate the intent to steal element of the robbery charges and the trial court otherwise properly instructed the jury on this element, it was not required to instruct on the defense in the absence of a request by trial counsel." (*People v. Covarrubias* (2016) 1 Cal.5th 838, 874.) In so doing, the Court "disapprove[d] *Russell* to the extent it is inconsistent with [its] decision." (*Id.* at p. 874, fn. 14.)

The trial court was not obligated to provide a sua sponte claim of right jury instruction.

IV

*The Use of Dr. Kelly's Evaluation for Impeachment Was Not Prejudicial*

Defendant argues that the People violated his Fifth Amendment right against self-incrimination when, at trial, the prosecutor attempted to impeach him using statements made during his court-ordered competency evaluation.  Additionally, defendant argues that, to the extent his trial counsel failed to object to the prosecutor's use of defendant's statements during his competency examination, trial counsel was prejudicially ineffective.  The People do not dispute that the Fifth Amendment's privilege against self-incrimination bars prosecutors from using defendants' statements made during competency evaluations to prove their cases.  However, the People argue (1) defendant forfeited his right to make this claim on appeal by failing to object at trial, (2) any error in admitting the evidence was harmless beyond a reasonable doubt, and (3) any error by trial counsel in failing to object was not prejudicial.   We agree with the People.

"[T]he Fifth Amendment's privilege against self-incrimination prohibits the prosecution from using at trial, for the purpose of impeachment, statements a defendant has made during a court-ordered mental competency examination."  (*People v. Pokovich* (2006) 39 Cal.4th 1240, 1253.)  "Under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L. Ed. 2d 705, 87 S. Ct. 824], a violation of a criminal defendant's federal constitutional rights requires reversal of the judgment unless the reviewing court determines 'beyond a reasonable doubt that the error complained of did not contribute to the verdict.' "  (*People v. Pokovich, supra,* at pp. 1254-1255.)  However, a defendant that fails to raise a Fifth Amendment claim before the trial court forfeits the claim on review.  (*People v. Huggins* (2006) 38 Cal.4th 175, 240, fn. 18.)

Here defendant made no Fifth Amendment objection to the prosecutor's efforts to impeach him using statements made during defendant's interview with Dr. Kelly.  As

19

such defendant forfeited his ability to raise a claim on appeal that the questioning violated his Fifth Amendment rights.

Even if defendant had raised an objection to the People's questioning below, beyond a reasonable doubt the error did not contribute to the verdict:  Defendant openly testified that he consumed methamphetamine twice before he went to the CVS drugstore. Thus, the use of defendant's competency evaluation statements about his prior drug use did not give the jury information it did not otherwise receive from defendant's own testimony.  For the same reason defense counsel's failure to object did not prejudice defendant's case.

V

*The Record Does Not Show the Trial Court Would Not Allow Trial Defense Counsel to Ask Any Questions About the Dr. Kelley Interview*

Defendant argues he was "denied . . . a meaningful opportunity to present a complete defense" when the trial court prevented a "redirect examination about his 1368 competency evaluation."  This argument lacks merit because the record does not demonstrate, as defendant argues, that defense counsel was "precluded" by the trial court from attempting to rehabilitate the defendant and providing context about defendant's interview with Dr. Kelly.  Instead, the record reflects that the People raised a sustained objection when defendant responded to a question about what the subject of the Dr. Kelly interview was by identifying the first defense counsel with whom he worked.  It is possible that the prosecutor objected because this response was technically nonresponsive to the question asked, and/or it suggested that defendant's next statements might tread into the realm of revealing privileged communications with his attorney.  After the objection was sustained, defense counsel was given the opportunity to continue questioning, but he opted not to.  Without a record of further questioning, or of any effort by defense counsel to push for further questioning on this topic, or an offer of proof, it is

impossible to know what exactly defense counsel would have attempted to accomplish with further questioning or the precise limits the trial court would have placed on that questioning.

## VI

### *CALCRIM No. 252 Did Not Cause Confusion*

Defendant argues that CALCRIM No. 252, the jury instruction the trial court gave regarding the need for the jury to find both a wrongful act and a wrongful intent, erroneously allowed the jury to find defendant guilty of robbery and burglary without finding he intended to permanently deprive an owner of its property. We disagree.

To fully understand how CALCRIM No. 252 operated in this case, we need to consider CALCRIM No. 252 and the instructions provided for robbery, theft, and burglary. (See *People v. Wilson* (2008) 44 Cal.4th 758, 803 [jury instructions are reviewed in context, considering, among other things, other jury instructions].)

As given CALCRIM No. 252 provides:

> "The crimes charged in this case require proof of the union, or joint operation, of act and wrongful intent.
>
> "The following crimes and allegations requires [*sic*] general criminal intent: Resisting arrest as alleged in Count 5. For you to find a person guilty of this crime, that person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he intentionally does a prohibited act[. H]owever, it is not required that he intend to break the law. The act required is explained in the instruction for that crime.
>
> "The following crimes require a specific intent or mental state: Robbery as alleged in Count 1, burglary as alleged in Counts 2, 3, and 4, and the lesser crime of theft by larceny. For you to find a person guilty of these crimes, the person must not only intentionally commit the prohibited act but must do so with a specific intent and/or mental state. The act and the specific intent and/or mental state required are explained in the instructions for those crimes."

21

CALCRIM No. 1600 describes robbery as:

"The defendant is charged in Count 1 with robbery in violation of Penal Code section 211.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1.  The defendant took property that was not his own;

"2.  The property was in the possession of another person;

"3.  The property was taken from another person's or his or her immediate presence;

"4.  The property was taken against the person's will;

"5.  The defendant used force or fear to take the property or to prevent the person from resisting;

"AND

"6.  When the person used force or fear to take the property, he intended to deprive the owner of it permanently or to remove it from the owner's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property.

"Defendant's intent to take the property must have been formed before or during the time he used force or fear.  If the defendant did not form this required intent until after using the force or fear, then he did not commit robbery.  [¶] . . . [¶]

"A store or business employee who is on duty has possession of the store or business owner's property.  [¶]  . . .  [¶]

"The application of force or fear may be used when taking the property or when carrying it away."

CALCRIM No. 1700 describes burglary as:

"The defendant is charged in Counts 2, 3, and 4 with burglary in violation of Penal Code section 459.

22

"To prove that the defendant is guilty of this crime, the People must prove that:

"1.  The defendant entered a building;

"AND

"2.  When he entered a building, he intended to commit theft.

"To decide whether the defendant intended to commit theft, please refer to the separate instructions that I will give you on that crime."

Finally, CALCRIM No. 1800 describes theft by larceny as:

"The elements of theft by larceny are as follow:

"1.  The defendant took possession of property owned by someone else;

"2. The defendant took the property without the owner's or owner's agent's consent;

"3.  When the defendant took the property he intended to deprive the owner of it permanently or to remove it from the owner's or owner's agent's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property.

"AND

"4.  The defendant moved the property, even a small distance, and kept it for any period of time, however brief."

A single instruction to a jury "may not be judged in artificial isolation, but must be viewed in the context of the overall charge." (*Cupp v. Naughten* (1973) 414 U.S. 141, 146-147 [38 L.Ed.2d 368]; see also *People v. Haskett* (1990) 52 Cal.3d 210, 235.)  In performing this evaluation, "we presume that jurors understand and follow the [trial] court's instructions." (*People v. Gray* (2005) 37 Cal.4th 168, 231.)  Thus, "[w]hen an appellate court addresses a claim of jury misinstruction, it must assess the instructions as

a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner." (*People v. Wilson, supra,* 44 Cal.4th at p. 803.)

Here, CALCRIM No. 252 informed jurors that they must find both the wrongful intent and the wrongful act for each crime in order to find the defendant guilty. It indicated that, "[f]or [the jury] to find a person guilty of," robbery as alleged in Count 1 or burglary as alleged in Counts 2, 3, and 4, it "must" find that person "not only intentionally commit[ed] the prohibited act but [did] so with a specific intent and/or mental state." (*Ibid.*) It also instructed the jury that, "[t]he act and the specific intent and/or mental state required are explained in the instructions for those crimes." (*Ibid.*) Those specific instructions to which the jury was directed then explained that for the crime of robbery, the jury would need to find that when the defendant used force or fear he "intended to deprive the owner of [the property] permanently or to remove it from the owner's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property." For burglary, the instructions told the jury it would need to find the defendant entered the building with the intent "to commit theft." Then an additional instruction clarified that "theft" occurs when the actor takes property and "intend[s] to deprive the owner of it permanently or to remove it from the owner's or owner's agent's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property." Taken together, including CALCRIM No. 252's reference to other instructions defining specific crimes, these instructions told the jury they needed to find defendant both performed a wrongful act and formed a wrongful intent and that the wrongful intent for these crimes was a specific intent to deprive another person of their property. These instructions did not create an ambiguity that would have caused the jury to apply them in an impermissible manner. The trial court did not commit reversible error in giving these instructions.

Because the instructions properly instructed the jury on the nature of intent findings it would need to reach, defendant's claims of ineffective assistance due to trial counsel's nonobjection to CALCRIM No. 252 also fails.

## VII

### *There Is No Cumulative Error*

Defendant asserts the errors he alleges occurred at trial constitute cumulative error that deprived him of his federal and state constitutional rights to due process and a fair trial. We disagree. In each case of asserted error at trial we have found either no error or that any possible error was not prejudicial. As such, the cumulative effect of any possible errors is not prejudicial. (See *People v. Eubanks* (2011) 53 Cal.4th 110, 152 ["[h]aving found only minor harmless errors during defendant's trial, we reject her claim of cumulative effect"].)

## VIII

### *Defendant Is Entitled to A Determination on Whether He Qualifies for Pretrial Mental Health Diversion*

This case must be remanded to allow the trial court to consider whether defendant is eligible and an appropriate candidate for pretrial diversion based on his schizophrenia diagnosis.

The trial court entered its judgment and sentenced defendant in August 2015. "In June 2018, the Legislature enacted Penal Code sections 1001.35 and 1001.36, which created a pretrial diversion program for certain defendants with mental health disorders. (Stats. 2018, ch. 34, § 24.)" (*People v. Frahs* (2020) 9 Cal.5th 618, 624 (*Frahs*).) Section 1001.36 allows a trial court to grant pretrial diversion to a defendant suffering from a qualifying mental disorder if certain criteria are satisfied. (Subd. (a).) One of the qualifying mental illnesses is schizophrenia. (*Id.*, subd. (b).) Qualifying criteria include

25

satisfying the court that "the defendant's mental disorder was a significant factor in the commission of the charged offense[;]" securing the "opinion of a qualified mental health expert, [that] the defendant's symptoms of the mental disorder motivating the criminal behavior would respond to mental health treatment[;]" and satisfying the court "that the defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (*Ibid.*)  If a trial court grants pretrial diversion and later finds the defendant has satisfactorily completed the specified mental health program, the trial court "shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion." (*Id.*, subd. (e).)  Section 1001.36 was amended in 2020 to remove defendants accused of certain crimes from pretrial diversion eligibility, but none of those crimes are at issue in this case. (*Id.*, subd. (d); see also Stats. 2019, ch. 497, § 203.)

Defendant filed a supplemental brief arguing that he is entitled to a remand to allow the trial court to determine whether to grant him a section 1001.36 diversion to treat his schizophrenia.  The People filed a response arguing the defendant is not entitled to a remand because section 1001.36 is not retroactive.  Since the parties filed their supplemental briefs, our Supreme Court has found that "section 1001.36 applies retroactively." (*Frahs*, *supra*, 9 Cal.5th at p. 637.)  Additionally, the Court found that in cases where judgment was entered before section 1001.36's enactment, "a conditional limited remand for the trial court to conduct a mental health diversion eligibility hearing is warranted when . . . the record affirmatively discloses that the defendant appears to meet at least the first threshold eligibility requirement for mental health diversion--the defendant suffers from a qualifying mental disorder." (*Id.* at p. 640.)

Based on *Frahs* and defendant's schizophrenia diagnosis, we grant the defendant a conditional limited remand to determine his eligibility for a section 1001.36 mental health diversion.

## IX

*We Strike the One-Year Section 667.5 Enhancement*

While the appeal was pending, Senate Bill No. 136 (2019-2020 Reg. Sess.) became law, and "eliminate[d] the section 667.5 one-year prior prison term enhancement for all prior convictions, except sexually violent offenses." (*People v. Bermudez* (2020) 45 Cal.App.5th 358, 378.)

Defendant argues that we should apply *In re Estrada* (1965) 63 Cal.2d 740 and remand the case with directions to strike the one-year prior prison term enhancement, because Senate Bill No. 136 is ameliorative and applies retroactively to his case, which is not yet final on appeal. The People agree the amended version of section 667.5 applies here, and so do we. Because Senate Bill No. 136 became effective before defendant's judgment became final, we agree with the parties that the amended law applies to him retroactively. (See *Estrada*, *supra*, 63 Cal.2d at pp. 744–745 [absent evidence of contrary legislative intent, ameliorative criminal statutes apply to all cases not final when statute takes effect].) Accordingly, defendant's 667.5 subdivision (b) enhancements must be stricken.

## DISPOSITION

We remand this case with instructions to strike the section 667.5, subdivision (b) one-year sentence enhancement imposed for defendant's prison prior and to consider whether defendant is eligible for pretrial diversion under section 1001.36. If the trial court grants section 1001.36 pretrial diversion, and defendant successfully completes a diversion program as determined by section 1001.36, the judgment shall be vacated. If either the trial court denies pretrial diversion pursuant to section 1001.36 or if defendant fails to successfully complete a diversion program, the trial court determination and sentence shall stand, with the exception of the one-year enhancement. The trial court shall prepare an amended abstract of judgment reflecting the deletion of the section

27

667.5, subdivision (b) enhancement and forward a certified copy to the Department of Corrections and Rehabilitation.

 

 

 

                                        _____

                                        HULL, Acting P. J.

 

 

We concur:

 

 

_____

MAURO, J.

 

 

_____

MURRAY, J.